## In re Agency of Administration, State Buildings Division

[444 A.2d 1349]

No. 398-80

Present: **Barney, C.J., Billings, Hill and Underwood, JJ., and Larrow, J. (Ret.), Specially Assigned**

Opinion Filed March 25, 1982

*Alan D. Port* of *Paul, Frank & Collins, Inc.*, Burlington, for Appellant.

*McKee, Giuliani & Cleveland,* Montpelier, for City of Montpelier.

*Paterson, Walke & Pratt,* Montpelier, for Appellees.

**Barney, C.J.** This case raises for our determination the question of the district environmental commission's jurisdiction over a state demolition project in the city of Montpelier.

In an order dated October 29, 1980, the Environmental Board ruled that demolition of the wood frame house located at #8 Baldwin Street constituted the commencement of construction on a state project involving more than ten acres of land, and was therefore subject to Act 250, Vermont's land use and development law. This ruling required the State Buildings Division to follow certain permit application procedures specified in the law. It was based on the Board's finding that although the Baldwin Street property itself comprised less than one acre, its demolition was part of a larger plan to

construct a state office building in the northwest corner of the statehouse green. This greater project, the Board found, would involve more than the requisite acreage, and would thus be sufficient to trigger the Act 250 process. The Board's decision affirmed an earlier ruling of the district environmental commission to the same effect.

The State Buildings Division, which had petitioned for the ruling in the first place, now challenges the Board's finding and denies that the demolition is part of any larger plan. It argues that the Board misconstrued the legal effect of certain planning documents offered as exhibits, which are admittedly in circulation as general guides to planning, but which, it maintains, have never been approved or adopted by the Legislature and do not amount to a plan of development.

The facts of the case are not in dispute. On May 6, 1980, the Governor approved and signed into law Public Act No. 176 of the Adjourned Session, 1980, "An Act to Appropriate Capital Funds for Various Purposes and to Authorize the Issuance of Bonds Therefore." The Act expressly provided funds for the demolition of #8 Baldwin Street, a badly deteriorating structure which was felt not to be worth saving.

Following the enactment of No. 176, the director of State Buildings arranged for the demolition to begin in early July. The director testified before the Board that his only plan for the property following demolition was to seed it down and grass it over, and he said that in presenting his request for authorization to demolish to the Legislature he had had nothing in relation to the capitol complex in mind.

Shortly after the work began the director was advised by the agency of environmental conservation that a permit for the demolition work might be required under Act 250, and, although he personally believed he had received an unconditional mandate from the Legislature, in good faith he ordered a halt to the project and requested a ruling on its status from the district environmental commission.

The district commission's response was that the demolition did indeed require the issuance of an Act 250 permit. In an advisory letter dated July 21, 1980, the district coordinator wrote that, based on his review of facts presented by the director, as well as his review of a document entitled *State of Vermont Capitol Complex*, December 1979 [sic], it was his

determination that the demolition constituted the commencement of construction on a proposed development, which he referred to as the "Capitol Complex." The coordinator called the demolition "just one activity among others required to take place in order for the Complex to become a reality."

The State Buildings Division appealed the commission's ruling to the state Environmental Board pursuant to 3 V.S.A. § 808 and Board Rule 4. The City of Montpelier, the Central Vermont Regional Planning Commission, the Division of Historic Preservation and the Montpelier Heritage Group joined in the fray, the last two groups because the building is located within a registered historic district. A public hearing was held on August 12, 1980. Subsequent to the hearing the Board affirmed the commission's ruling, and following that action the State Buildings Division brought its case here.

## I.

We approach this review of administrative agency action with a gingerly step. Bathed in a singleness of concern and anointed with an aura of expertise, administrative actions have traditionally kept reviewing courts an arm's length away. This Court has been no exception. Repeatedly we have articulated our willingness to defer to agency determinations, *Genier* v. *Department of Employment Security*, 140 Vt. 453, 438 A.2d 1116 (1981); *State Department of Taxes* v. *Tri-State Industrial Laundries, Inc.*, 138 Vt. 292, 294, 415 A.2d 216, 218 (1980); *In re Young*, 134 Vt. 569, 570, 367 A.2d 665, 666 (1976); *International Association of Firefighters Local #2287* v. *City of Montpelier*, 133 Vt. 175, 178, 332 A.2d 795, 797 (1975), and we have no wish to repudiate that position here.

Where warranted by the evidence, an administrative board's findings of fact are conclusively binding on this Court. *Norman* v. *American Woolen Co.*, 117 Vt. 28, 31, 84 A.2d 125, 127 (1951). We will uphold the validity of an administratively adopted rule where we can do so without compromising the intent of the statute which authorized it, *Committee To Save the Bishop's House, Inc.* v. *Medical Center Hospital of Vermont, Inc.*, 137 Vt. 142, 150, 400 A.2d 1015, 1019 (1979), and construction of statutes by those charged with their

execution will be followed unless there are compelling indications that the construction is wrong. *Id.* at 150, 400 A.2d at 1019–20 (citing *Red Lion Broadcasting Co.* v. *Federal Communications Commission,* 395 U.S. 367, 381 (1969)).

 Still, under our constitutional system, administrative agencies are subject to the same checks and balances which apply to our three formal branches of government. An agency must operate for the purposes and within the bounds authorized by its enabling legislation, or this Court will intervene. Where it exercises its adjudicative function we will be especially vigilant, since proper utilization of the judicial process is unrelated to expertise in any particular subject matter. Although findings of fact of an administrative agency will not be set aside unless clearly erroneous, *In re Young, supra,* conclusions of law are not so protected. *In re McGrath,* 138 Vt. 77, 82, 411 A.2d 1362, 1365 (1980).

With this understanding in mind we must first look to the statutes for guidance in determining whether or not this demolition project was intended to be subject to their provisions. The Act 250 permit requirement itself declares that "[n]o person shall . . . commence construction on a . . . development, or commence development without a permit. . . .", 10 V.S.A. § 6081(a). The law then limits that sweeping requirement, however, by defining development, in pertinent part, as "the construction of improvements on a tract of land involving more than 10 acres which is to be used for municipal or state purposes." 10 V.S.A. § 6001(3).

The Environmental Board saw fit to interpret this statute by defining development in its Rule 2(A)(4) as follows:

"Development" means: (4) The construction of improvements for state, county or municipal purposes, on a tract or tracts of land involving more than ten acres of land. For state and municipal projects only, the computation of involved land shall include the land which is incidental to the use such as lawns, parking lots, driveways, leach fields, and accessory buildings. In the case where a state or municipal project is to be completed in stages according to a plan or it is evident under the circumstances that a project is incidental to or a part of a larger under-

taking, all land involved in the entire project shall be included for the purposes of determining jurisdiction;

It is with the application of this rule to the facts of this case that our problems with the Environmental Board begin.

■ ■ An administrative agency may not use its rule-making authority to enlarge a restrictive grant of jurisdiction from the legislature. Where a statute is said to be susceptible of more than one meaning, and an agency seeks to define it, we will consult not only the bare statutory language, but will seek out the interpretation intended by the statute's drafters to assure that the statute is being construed, rather than constructed anew. *National Petroleum Refiners Association* v. *FTC*, 482 F.2d 672, 690 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 951 (1974).

■ ■ As this Court has previously stated, although the purposes of Act 250 are broad, the Legislature in passing the Act did not purport to reach all land use changes within the state, nor to impose the substantial administrative and financial burdens of the Act, or interfere with local control of land use decisions, except where values of state concern are implicated through large scale changes in land utilization. *Bishop's House, supra,* 137 Vt. at 151, 400 A.2d at 1020. The Act was a philosophic compromise between a desire to protect and control all the lands and environment of the state of Vermont, and the need to avoid an administrative nightmare. Hearing on H.417, Senate Natural Resources Committee, March 16, 1970. The importance of this compromise aspect of the legislation to our decision here is well illustrated by the history behind the legislative definition of "development" now codified at 10 V.S.A. § 6001(3).

A.

When first introduced in the House on January 30, 1970, Act 250 specifically exempted all activities of state government from its definition of development:

"Development" means an enterprise wherein land in excess of 10 acres in area is held or used or is to be held or used directly or indirectly for income producing pur-

poses, excepting only bona fide farming and forestry enterprise conducted below the elevation of 2500 feet and the activities of a state agency, or a municipality for municipal purposes exclusively, and shall also mean one or more enterprises located within five miles such that the total area within five miles exceeds 10 acres.

1970 H.417 (Adjourned Session) § 2(2).

The Committee on Natural Resources, to which the bill was first referred, apparently felt that the total exclusion of state and municipal activities was in conflict with the broader purposes of the Act. On March 4, 1970, the bill appeared on the House floor in amended form, and the definition of "development" read as follows:

"Development" means a tract or tracts of land, involving more than 10 acres of land within a distance of five miles owned or controlled by a person, which are to be used, or are incident to the use, for commercial, housing (involving 10 or more units) or industrial purposes. Provided the word "development" shall not include bona fide farming, lumbering and forestry enterprises conducted below the elevation of 2500 feet. The word "development" also means a tract of land involving more than 10 acres of land owned or controlled by a municipality or state agency which is to be used or is incident to the use for municipal or state purposes when improvements are to be constructed. Provided, however, that the word "development" shall not include an electric generation or transmission facility which requires a certificate of public good under section 246 of Title 30.

1970 Journal of the House 222 (March 4, 1970).

In addition to the fact that previously exempt municipalities and state agencies were now covered by the definition, two other changes made in the second version are noteworthy. First, the focus of the definition, which had been on the activity undertaken, the "enterprise" referred to in the original bill, was now on the land, the "tract or tracts," instead. Secondly, this change in focus was rejected.

When the amended bill came before the Senate Natural Resources Committee, the Chief of the Environmental Control

and Community Affairs Division of the Attorney General's office, which had drafted the bill, testified as follows on the definitional intent:

> What we are controlling [with the permit requirement] are subdivisions and developments.
>
> If we revert back to Definitions . . . the definition of a development, they define it in terms of construction of improvements on an area of land in excess of ten acres; commercial, housing, industrial types of improvements. Anything done of this nature on an area in excess of ten acres is subject to this regulation. Further in the definitions . . . you will see the definition of subdivision— dividing of a parcel for the purpose of resale into ten or more lots. . . . With those two definitions in [the permit requirement section] you are attempting to set up a procedure whereby any industrial, commercial, housing development on an area in excess of ten acres, or a subdivision of land into ten or more parcels, is subject to this regulation and is prohibited unless a permit is granted.

Hearing on H.417, Senate Natural Resources Committee, March 16, 1970.

In apparent response to this and other testimony, the definition of development was again rewritten. The focus was returned once more to the activity, this time referred to as the "construction of improvements." Jurisdiction, which previously had been triggered when land was merely "held" or "to be used" for development purposes, was now invoked only when the activity was about to impinge on the land. This change brought the definitional section into harmony with the time frame of 10 V.S.A. § 6081, which only requires a permit when construction is about to commence.

This third version of the definition was passed into law:

> "Development" means the construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial, or industrial purposes. "Development" shall also mean the construction of improvements for

commercial or industrial purposes on more than one acre of land within a municipality which has not adopted permanent zoning and subdivision bylaws. The word "development" shall mean the construction of housing projects such as cooperatives, condominiums, or dwellings, or construction or maintenance of mobile homes or trailer parks, with 10 or more units, constructed or maintained on a tract or tracts of land, owned or controlled by a person, within a radius of five miles of any point on any involved land. The word "development" shall not include construction for farming, logging or forestry purposes below the elevation of 2500 feet. The word "development" also means the construction of improvements on a tract of land involving more than 10 acres which is to be used for municipal or state purposes. In computing the amount of land involved, land shall be included which is incident to the use such as lawns, parking areas, roadways, leaching fields and accessory buildings. The word "development" shall not include an electric generation or transmission facility which requires a certificate of public good under section 248 of Title 30. The word "development" shall also mean the construction of improvements for commercial, industrial or residential use above the elevation of 2500 feet.

1970 Journal of the House 631 (April 2, 1970); 10 V.S.A. § 6001(3).

■■■ We believe that this legislative history discloses a well-considered intent on the part of the Legislature to define as "development" only that activity which has achieved such finality of design that construction can be said to be ready to commence. That being the case, we turn to the Board's application of Rule 2(A)(4) in this case to see whether this limitation was properly carried forward.

## B.

It is agreed by all parties that the subject tract of land, #8 Baldwin Street, is itself less than one acre. Since the testimony of the director of State Buildings that no use at all was planned for the tract upon demolition was uncontradicted, there was no possibility that 10 acres of involved land could

be found by finding additional land "incidental to the use" of the subject tract under the first part of the rule. Something cannot be incidental to nothing.

The Board then looked to the second part of the rule, which provides that "where a state or municipal project is to be completed in stages according to a plan . . . all land involved in the entire project shall be included for the purposes of determining jurisdiction." Reviewing the evidence before it and applying the rule, the Board found such a project in the "masterplan" documents for the capitol complex, and ruled that the district environmental commission had jurisdiction over the demolition.

Our problem is with the Board's interpretation of the word "plan" as that word appears in its rule. We believe that the Board interpreted this term incorrectly, and in doing so caused the rule to violate the statute. Because we further find that when a correct interpretation of "plan" is applied to the facts of this case, the evidence fails to support the Board's findings, or conclusions and order, we reverse.

It is of course axiomatic that a plan is not a plan within the meaning of the law simply because it calls itself a plan, or because someone refers to it as such. The Board and the appellees stress the fact that the Legislature directed preparation of a "plan," and that the series of brochures which issued in response to that directive refer to themselves as "masterplans." They place great stock in the fact that the director of State Buildings, in testimony before the Board, himself referred to the "masterplan" as a "plan" and stated that in prior testimony before the Senate Institutions Committee on April 10, 1979 (regarding a different appropriations bill involving the demolition of different properties), he had argued for demolition funds in "continuation of providing space for the capitol complex plan."

Aside from the fact that the director also qualified those remarks by explaining that he wanted to remove this structure so that the land *could* be available *if* projects were authorized in the future, we cannot allow these remarks by a state employee to color our construction of legal language. Our starting point must be with the plain meaning of the words in

question themselves. *Eastern Advertising, Inc.* v. *Cooley,* 126 Vt. 221, 223, 227 A.2d 294, 295 (1967).

Webster's Dictionary explains that "plan" is a "general word for a proposed method of action or procedure" and indicates a broad spectrum of acceptable definitions ranging from the concrete *"design,"* implying "a settled plan," heightened as to "the suggestion of intention or purpose," to the more abstract *"project,"* which it defines as "a tentatively devised and often impracticable plan," or *"scheme,"* which is defined as "a more or less speculative project." Webster's New International Dictionary 1879 (2d ed. 1961) (emphasis added). Even this sorting out of synonyms is not exhaustive, however, the same dictionary defining *"proposal"* as "something proposed for consideration or acceptance; an offer . . . a scheme, a *plan,* a bid, or the like, formally submitted . . . ." *Id.* at 1985 (emphasis added). Thus, we are left with the problem of locating a meaning of "plan" which is appropriate to this case.

An administrative rule does not violate its enabling statute so long as the substantive requirements of the statute are not compromised by its language. *In re Allied Power & Light Co.,* 132 Vt. 354, 360, 321 A.2d 7, 11 (1974). Where an ambiguous term in an administrative rule can be construed to bring the rule within those requirements, and avoid the necessity for striking it, we will do so. Cf. *In re Roberts,* 111 Vt. 91, 93, 10 A.2d 1, 2 (1940). Having determined that 10 V.S.A. § 6001(3) requires development activity to have achieved a finality of design and a readiness of performance before jurisdiction is triggered, we find that we must interpret "plan," as that term appears in Rule 2(A)(4), to require the same degree of specificity and concreteness.

The balance of the legislative scheme which obtains at 10 V.S.A. Chapter 151 supports this interpretation. Acquisition of an Act 250 permit is a complicated matter. The applicant must file multiple documents with the district environmental commission, specifying in detail the project to be executed. 10 V.S.A. § 6083. Notice, and copies of the application in some cases, must be sent to local and regional planning commissions, posted in the town clerk's office, forwarded to the Environmental Board and other affected agencies, and pub-

lished in a newspaper of general circulation. 10 V.S.A. § 6084. At the request of anyone required to receive notice, any adjoining property owner, or any other person authorized by Board rule, a hearing on the application for a permit must be held. 10 V.S.A. § 6085.

Before a permit is granted, the Board or the district commission must review the plan, and find that the development project will not have an undue adverse effect on any one of a number of criteria, including water quality or supply, air quality, soil cohension, highway safety, scenic beauty, aesthetics, historic sites, rare and irreplaceable natural areas, wildlife, or the ability of local governments to provide services such as education, water, sewage disposal, road maintenance, police or fire protection. Within each of these general areas, a number of specific tests must be met and passed. The plan must also be in conformance with any other existing plan of local or regional origin. 10 V.S.A. § 6086.

It seems a matter of elementary logic that in order for this extensive permit process to have any meaning whatsoever, the "plan" which triggers it must be sufficiently firm and detailed to give the notice it contemplates and which is constitutionally required, and which is also essential to effect its purposes.

■ Both the legislative history and the legislative scheme of Vermont's land use and development law therefore demand an interpretation of "plan" which carries forward the statutory requirement of activity so settled in intention and purpose that it can be called ready to commence. And, while the Board never considered the possible application of Rule 2(A)(4)'s final provision, that development also means "a state or municipal project . . . [where] it is evident under the circumstances that [it] is incidental to or a part of a larger undertaking," we believe that it goes without saying that this same requirement would have to be met.

■ Our duty is to support the Board's findings unless they are clearly erroneous. In this case we believe that they are. The Board's reliance on the "capitol complex masterplans" for its finding of a state development project to be completed in stages according to a plan was both misplaced as a matter of fact and wrong as a matter of law. When the

proper interpretation of Rule 2 (A) (4) is applied, the evidence in this case not only falls short of supporting the Board's findings, but persuades us that a contrary conclusion must be reached.

## II.

The term "capitol complex" was first used in connection with this case in the district environmental commission's advisory letter to the State Buildings Division, informing them that the demolition of #8 Baldwin Street would require an Act 250 permit. In that one short document the term occurs in three different contexts, which collectively illustrate the semantic entanglement this case has become.

The district coordinator first uses the term in reference to a document entitled *State of Vermont Capitol Complex*, dated December 1979 [sic]" which he explains in his letter was one of the bases for his decision to require an Act 250 permit for the demolition project. This document, actually a brochure issued in December, 1974, over the names of the governor, the secretary of the agency of administration, the director of State Buildings, and Robert Burley Associates, Architects, bills itself as an updating of a 1968 "masterplan" and as a guide for continuing development of "the site." In fact it is the third in a series of three brochures published in 1966, 1968, and 1974, which report and update the results of a study of Vermont state government's office space requirements and propose ways in which those requirements might be met through major construction projects.

The office space study was first undertaken in 1965 or 1966, apparently on the strength of a $10,000 appropriation to a "planning fund" in a line item of Public Act No. 130 of the 1965 Session, a general appropriation bill. It was first reported in a brochure dated March, 1966, which appeared over the names of the governor, the director and assistant director of the central planning office, the board of state building, the director of the State Buildings Division, Robert A. Burley, architect, and John Calbreath Burdis, planning consultants.

The 1966 brochure stated that it had been financed in accordance with No. 130, Acts of 1965, "authorizing the development of a masterplan for future State Buildings in the Capital [sic] Complex." This attribution, on its face a rather

formidable directive, evaporates on closer examination since neither the Act, nor H.52 as it was originally introduced, ever mention either a "masterplan" or a "capitol complex." This discrepancy between what the report was originally intended to represent, and what it appeared to be upon issuance, may have presaged the present dispute. For to a large extent this case tells the story of a self-fulfilling prophecy, in which a proposal that called itself a plan, and a "masterplan" at that, eventually convinced a number of decision makers, erroneously, that it was one.

The 1966 brochure contains the earliest mention of the term "capitol complex":

> Expanding the space required to carry out the functions of State Government was . . . achieved for almost a century by simply making each new Statehouse larger or by finally adding an annex to the present building. However, the construction of the Supreme Court and Library Building in 1915 ended the period in which a single building was sufficient and began the formation of what might be called a Capital [sic] Complex.

*State of Vermont Capitol Complex Masterplan,* Introduction. It is noteworthy that, as used here, the term "capitol complex" did not refer to any proposal for the future, let alone a settled project or planned undertaking, but was merely a collective reference to all the facilities of Vermont state government. In addition, the fact that both the 1968 and 1974 brochures continued to debate the relative merits of centralizing or decentralizing the "capitol complex" suggests that the term was not meant, and cannot be taken, to refer to any single future project with a fixed location. *State of Vermont Capitol Complex,* May 1968, p. 17; *State of Vermont Capitol Complex,* December 1974, p. 19.

The second use of the term "capitol complex" in the advisory letter from the district environmental commission is in a reference by its author to the State Buildings director's earlier letter to the commission, in which the director requested the declaratory ruling. The commission coordinator wrote:

> In your letter of July 21, 1980 you state that the "total area in the Capitol Complex is over 10 acres."

This use of the term is a reference to a statutorily defined, geographically bounded area called the "capitol complex," an historic district designated by the Legislature in 1974, Act No. 269 of the 1973 Adjourned Session, now codified at 29 V.S.A. § 182(1). This area, comprising approximately 27 acres, includes 23 acres of state-owned property generally surrounding the statehouse green. It is specifically described as:

[A]ll of the land and buildings in the city of Montpelier, excluding so much of State Street as lies within the boundaries thereof, enclosed within the following described bounds: commencing at the juncture of Taylor Street, so-called, and north line of the Winooski River, thence northerly along the westerly line of Taylor Street, crossing State Street and continuing northerly along the westerly line of the extension of Taylor Street, crossing Court Street at an angle to the westerly line of Greenwood Terrace, thence continuing northerly along the westerly line of Greenwood Terrace to a point on a line extension of the southerly line of Mather Terrace, thence westerly along the aforesaid line extension to Mather Terrace, thence westerly along the southerly line of Mather Terrace and Terrace Street to the intersection of Terrace Street and the easterly line of Bailey Avenue, thence southerly along the easterly line of Bailey Avenue crossing State Street and continuing along the easterly line of Bailey Avenue extension to the Winooski River, thence easterly along the northerly line of the Winooski River to the point of the beginning.

This historic district is functionally unrelated to the physical plant of Vermont state government.

In concluding his letter, the district coordinator refers to a "capitol complex" a third time as follows:

I view the Capitol Complex as being a State project involving greater than 10 acres and the demolition of the existing structure [#8 Baldwin] to be the commencement of construction for a part of that project which is a proposed development as defined by 10 V.S.A. § 6001(3).

Thus, by the time the matter of the demolition had cleared its first level of review, this crucial term "capitol complex" had

been used variously as a collective reference to all the existing facilities of state government, as a statutorily defined geographic area, and as a state development project which commenced with work on the demolition of #8 Baldwin Street.

We believe that beyond its statutory definition at 29 V.S.A. § 182 as a geographic district comprised of land and existing buildings, created for the "maintenance of the architectural and aesthetic integrity of [the] district," 29 V.S.A. § 181, "capitol complex" is only an ambiguous term meaning different things to different people and evoking widely disparate expectations. Had the Environmental Board in its deliberations taken time to unravel what was a mounting confusion, we believe that it might have reached a different result. Instead it compounded the problem.

The Board's third finding of fact reads as follows:

> The development of the Capitol Complex is governed by the provisions of 29 V.S.A. Chapter 6. This Chapter directs the State Buildings Division to prepare and submit to the legislature a Masterplan for the development of the Capitol Complex:
>
>> "In order to provide from time to time the offices and other facilities the state needs in Montpelier for the efficient administration of state government, the board of state buildings shall prepare a long-term plan for using state-owned land, acquiring other land and constructing office and other buildings and facilities near the state house. In doing so it shall consider modern government management practices and apply appropriate architectural principles in such a manner as to preserve and enhance aesthetic values and provide for the orderly development of those lands, buildings and facilities, including streets and parking areas. From time to time it shall review the plan and prepare proposed revisions of it. It shall submit the plan and proposed revisions to the general assembly for approval before beginning construction or reconstruction of any building." 29 V.S.A. § 158.

Environmental Board Declaratory Ruling #121.

With this erroneous finding the Board created for its conclusions and order a far stronger basis than in fact existed.

In the first place, 29 V.S.A. § 158, the section quoted, is not a part of Chapter 6, the chapter that governs the historic district. It is rather a part of Chapter 5, an unrelated section, which defines the authority of the State Buildings Division generally, and deals specifically with state property and supplies. Secondly, while the quoted section does direct the board of state buildings to prepare for legislative approval a long-term plan for land use and acquisition, and construction of office and other facilities, it makes no mention of any "masterplan" or "capitol complex," contrary to the Board's finding. Indeed no such reference could have been made since the first "masterplan" was published nearly a year prior to passage of § 158, and so, in concept, could not have been its child, and the statutory creation of the capitol complex historic district did not occur for another seven years.

If any conclusions at all can be drawn from the passage of the section quoted above, the legislative history suggests that those conclusions are contrary to the Board's finding.

29 V.S.A. § 158 is a codification of section one, Public Act No. 170 of 1967. This Act, introduced as H.8 on January 10, 1967, originally contained the following provision at Section 3:

> The state buildings division of the department of administration shall acquire land for and construct new office buildings and reconstruct and improve state-owned buildings north of State street and near the state house to provide office space and related facilities for the state departments and agencies, generally as provided in the capitol complex planning report entitled "State of Vermont Capitol Complex Masterplan, 1966."

The bill also included a section authorizing condemnation of land in the capitol complex area as necessary for the purposes of the Act, and appropriated $15,000,000 to advance those purposes.

When the bill emerged as law from the Legislature it had been thoroughly emasculated. The endorsement of the masterplan was gone, as was the authorization to acquire land, and the appropriation to do so. All that remained was the provision for a long-term plan, *to be submitted for approval*, and an appropriation of a fraction of the original amount.

The Board also found in its fourth finding of fact that the "capitol complex masterplan," although never formally adopted by the General Assembly, "has been used consistently as a framework and guide for development within the Capitol Complex by relevant decision makers, and especially by the [state buildings division], since its creation." Environmental Board Declaratory Ruling #121. It further found that the site at #8 Baldwin Street had been acquired in conformance with and in furtherance of this plan, in anticipation of the construction of a state office building on the site. *Id.*

We do not doubt that, perhaps since 1966, some decision makers within state government, including the director of State Buildings, have tried, where possible, not to act inconsistently with the proposals set forth in the "masterplans" of 1966, 1968 and 1974, when moving to meet the continuing need for space to house state agencies. Nor are we prepared to say that at some time in the future a state government building will not stand in the northwest corner of the statehouse green, looking much as the authors of these "masterplans" envision it in their minds today.

But however laudable the state's efforts to engage in long-range planning studies may be, and however attractive the recommendations which result from those studies may seem to persons in or out of state government, we are unable to say, as a matter of law, that they amount to a "plan" sufficient to trigger Act 250 jurisdiction, rather than to mere "proposals" of directions in which the state might go, sometime in the future, in meeting its office space requirements.

If the jurisdiction of Act 250 were invoked every time a spadeful of earth turned on state-owned property in apparent conformance with a proposal from a government planning group, the burden on state agencies to fulfill the requirements of the Act would be impossible to meet. We cannot believe that the Legislature intended such a result.

In any case, the Board badly misconstrues the evidence behind its findings and its conclusion that "A number of direct and significant acquisition, demolition and construction activities *in furtherance of the plan* have already been undertaken." (Emphasis added.)

With regard to the Pavilion Hotel project, the Board mistakes its chronology. Far from being a project which grew

out of the "masterplan" and was executed in furtherance of it, the purchase of an option on the Hotel occurred in December, 1965, prior to publication of the first "masterplan." In addition, H.27, "An Act to Appropriate Funds for the Purchase and Remodelling of the Pavilion Hotel. . . . ," which was also introduced before the first "masterplan" emerged, garnered its support from legislators who desired to bring under state control valuable land, regardless of what might be done with that land in the future. 1966 Journal of the House 254 (February 25, 1966). Finally, when supporters of H.76, a bill to demolish the hotel, and supporters of S.47, a bill to reconstruct it, squared off at a joint meeting of the Senate Appropriations and Institutions Committees on February 27, 1969, the compromise that they reached was hardly one which could be interpreted as a commitment to utilizing the hotel in any planned development project. That compromise provided for a special committee to negotiate the sale, or lease and restoration of the property, and failing that, to arrange for its demolition. 1969, No. 132.

Nor are the statehouse improvements good evidence that the "masterplan" was ever adopted as a development plan. Those improvements were part of a legislative package introduced in 1967 as H.8, already noted, which included an express endorsement of the "masterplan," provision for taking by condemnation in the capitol complex area, and an appropriation of $15,000,000 to build or renovate the buildings involved. Although the Legislature "bought" the idea of making necessary improvements in the statehouse, and agreed to engage in planning studies to be revised "from time to time," it expressly rejected any endorsement of the plan, and refused to tie any land acquisition activity to it, appropriating only $100,000 for this purpose. 1967, No. 170; see also 29 V.S.A. § 158.

Perhaps most telling are the remarks of the author of the "masterplans" before the House Appropriations Committee on March 22, 1967, when it took H.8 under consideration. He described the steps he felt were necessary for the "masterplans" to become a functioning plan. First, he said, was the approval of the "masterplan" "in every detail." Secondly, he indicated, would be authorization for the state to acquire property within the defined area, "because *if you decide* that

the complex should be kept in Montpelier it only makes sense that you should assure the land . . . ." (Emphasis added.) Third was the appropriation of $2,645,000 for the building of the Stage I building. Hearing on H.8, Capitol Complex, House Appropriations Committee, March 22, 1967. All of these provisions were killed before H.8 emerged as a public law. 1967, No. 170.

Finally, we consider the history of other legislation relating to construction of state office buildings in Montpelier which has been introduced since publication of the "masterplans" in 1966.

Although the second "masterplan" appeared in 1968, no bill introduced during the 1969 session mentioned either a "masterplan" or a "capitol complex." H.87, a bill which appropriated $5,000,000 for construction of a state office building across State Street from the present Administration Building, 1969 H.87, died that year in the House Institutions Committee. 1969 Journal of the House 51, 736.

In 1974 another bill providing for construction of a state office building in Montpelier was introduced with an appropriation of $6,500,000. 1974 H.533 § 1(j). This bill was amended to remove the appropriation for construction and replace it with one of $25,000 to update the *"plans to plan* a 50,000 square foot office building . . . ." 1973, No. 269 (Adjourned Session) § 1(j) (Emphasis added). This form of the bill passed through the Legislature and was signed into law.

In response to the $25,000 appropriation for "plans to plan" an office building, two brochures issued in December, 1974, with formats identical to those of the earlier "masterplans." One, billing itself as an update of the 1968 "masterplan," made current estimates of space requirements, discussed present uses, and, eight years after what the Board would have us believe was the formation of a definite plan of development, continued to *recommend* centralization of state government in Montpelier and *propose* a three-stage construction project. *State of Vermont Capitol Complex,* December 1974, pp. 8–18, 19, 26 (emphasis added).

The second brochure, a design for a "Stage II office building," also *proposed* a three-stage construction project, and *recommended,* as its first phase, the construction of a particular office building. *State of Vermont Capitol Complex Stage*

*II Office Building*, December 1974, p. 7 (emphasis added). Of particular interest in this brochure is a project schedule, or time line, which is not tied to any particular year, but indicates the order in which necessary steps must be taken. *Id.* at 17. The time line indicates that demolition for this project cannot take place prior to legislative approval of the construction of the building. Thus, by its own terms, this "masterplan" provides conclusive evidence that the demolition of #8 Baldwin Street, which was authorized prior to any approval of office building construction on its site, is not tied to any plan for construction of such a building, or to any development project.

And there is more. On March 12, 1980, the chairman of the House Institutions Committee testified before the House Appropriations Committee on H.601, the appropriations bill which by this time included authorization to demolish #8 Baldwin Street. 1979 H.601 (Adjourned Session) § 1(a)(9). Stating the position of the Institutions Committee that the "masterplans" again needed to be updated in view of changing energy and space requirements, and explaining that the proposed bill provided for the conversion of more Waterbury buildings to meet office space requirements, the chairman unequivocally stated, "It's a keep the plant going bill and does not represent any major new capital project at this point. . . ." Hearing on H.601, House Appropriations Committee, March 12, 1980.

We are therefore compelled to conclude that the demolition of #8 Baldwin Street is not part of a state development project within the meaning of either Rule 2(A)(4) or the Land Use and Development Act. We find that the razing of this building is not inconsistent with future use of the site for a number of purposes other than a state office building, or, indeed, with no future use of the site at all.

In our holding today we do not imply that the mere fact that a plan may be altered over time is sufficient to remove it from Act 250 jurisdiction. We only conclude that the "masterplan" proposals offered in evidence here, unendorsed in principle and unapproved and unfunded in their specifics by a legislature which has in fact acted to decentralize state government and move many agencies and depart-

ments out of Montpelier since the proposals were last revised seven years ago, are not enough.

### III.

Because many of the same legal principles which we have discussed above are determinative of the second question involved in this appeal, whether demolition alone ever constitutes "the construction of improvements," we pause to consider that issue here.

The term "construction of improvements" appears in the Land Use and Development Act's statutory definition of "development," without further comment, at 10 V.S.A. § 6001(3). Once again the Environmental Board has seen fit to interpret the statute with an explanatory rule of its own:

> "Construction of improvements" means any activity which extends, modifies, or initiates any use of the land, other than that which is principally for the preparation of plans and specifications that may be required and necessary for making application for a permit, such as test-wells and pits, percolation tests, and line-of-sight clearing for surveys, provided that no significant alteration of the land and land cover will result. Unless a district environmental commission or board approves more extensive exploratory work.

Environmental Board Rule 2(D).

Under the Board's rule, a demolition project which is unconnected to any plan of development for the site, being a modification of land use, comes within the broad definition of "construction of improvements" and, when it occurs on a tract or tracts of land involving more than ten acres, becomes "development" itself, subject to Board jurisdiction.

The State Buildings Division urges that Rule 2(D) exceeds the Board's authority to adopt such rules and regulations as may be necessary to carry out the provisions of the Act, 10 V.S.A. § 6025; *Bishop's House, supra,* 137 Vt. at 150, 400 A.2d at 1019. We are constrained to agree. "Construction of improvements" is a deliberately limited term. The Board's definition extends the term to "any activity," an extension that ignores the restrictive language of the statute itself. We

are forced to strike Rule 2(D) as being overbroad, since it goes beyond the clear intent of the enabling act and is not reasonably related to, or necessary for, its purposes. *Id.*

On February 3, 1970, the chairman of the Governor's Committee on Environmental Control, testifying before the House Committee on Natural Resources, introduced H.417, now Act 250, with the following words:

> Basically the purpose of the bill is to determine suitability of the land for development. It is a bill that creates a [sic] environmental control commission, a special agency which will be responsible for determining in case of large size development whether or not the prospective land is suitable for development of that type.

We are unable to find any reasonable connection between an isolated demolition project on any size tract of land, and the stated purpose of Act 250, to determine the suitability of land for large scale development of a type presumably to be described in a permit application. We accordingly hold that demolition does not constitute the construction of improvements unless it is the first step in a proven development project.

The Board complains that unless "construction of improvements" is construed to include demolition and clearing activity the Environmental Board will be unable to protect such valued things as aesthetics, scenic beauty and historic sites, which, it says are properly within its jurisdiction. Act 250 was never meant to establish Environmental Board jurisdiction over historic sites, scenic areas, wildlife, water, air, soil, or schools and highways per se. Important as these things are, their guardianship is the concern of other state agencies and administrative bodies, established by the Legislature for that purpose. Under Vermont's Land Use and Development Act, Environmental Board jurisdiction extends only over the impact of large scale development on them, and the difference is significant.

Because we find that the demolition of #8 Baldwin Street is not part of a development plan within the meaning of Act 250, and does not constitute the construction of im-

provements for that very reason, we do not reach the appellant's final arguments, that Act No. 176, by its terms, supersedes the authority of the land use and development laws, or that the Capitol Complex Commission's jurisdiction over the area is exclusive.

*The ruling of the Environmental Board is reversed.*

**Billings, J.,** dissenting. I must respectfully dissent from the majority opinion. I would hold that the Environmental Board (Board) did not exceed its authority in asserting jurisdiction over the 8 Baldwin Street, Montpelier, demolition project.

The majority found that the Environmental Board misinterpreted the word "plan" as that word is used in its Rule 2(A)(4) and in so doing caused the Rule to violate Act 250, the Vermont Land Use and Development Act, 10 V.S.A. §§ 6001–6092. They then held that when a correct interpretation of "plan" is applied to this case the evidence fails to support the Board's findings or conclusions. They further held that the demolition of 8 Baldwin Street is not the "construction of improvements." Accordingly they reversed.

I disagree with the majority for three reasons: (1) they do not use the appropriate standard of review, which is the narrow standard established in *Committee To Save the Bishop's House, Inc.* v. *Medical Center Hospital of Vermont, Inc.*, 137 Vt. 142, 150–51, 400 A.2d 1015, 1019–20 (1979), and which dealt directly with the review of Act 250 jurisdiction; (2) the Board's interpretation and application of the word "plan" was within the authority granted it by Act 250; and (3) the Board was correct in finding the demolition of 8 Baldwin Street to be the first step in the "construction of improvements."

I.

Act 250 empowers the Environmental Board to "adopt rules . . . to interpret and carry out the provisions of this chapter." 10 V.S.A. § 6025. Because of this delegation of legislative power to an administrative agency, the scope of our review is quite narrow.

It is a fundamental principle in the judicial review of administrative action that, where the empowering provisions of a statute authorize an agency to make such rules

and regulations as may be necessary to carry out the provisions of the Act, the validity of such rules or regulations will be sustained so long as they are reasonably related to the purposes of the enabling legislation. *Mourning* v. *Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973). It is a "venerable principle that construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co.* v. *Federal Communications Commission*, 395 U.S. 367, 381 (1969).

*Bishop's House, supra*, 137 Vt. at 150–51, 400 A.2d at 1019–20. This standard requires that much deference be given the Board's interpretations of the Act. The majority, having ignored it, fails to demonstrate that the Board's decision exceeded its authority under this standard. Applying the proper standard leads to the conclusion that the Board's decision should have been affirmed; the Board's rules are "reasonably related to the purposes" of Act 250 and there are no "compelling indications" that the Board's construction and application of the statute in this case were "wrong." Although another interpretation of the Act might be more persuasive, the Board's interpretation was not so unsupportable as to warrant reversal.

## II.

Act 250 requires that "[n]o person[1] shall . . . commence construction on a . . . development, or commence development without a permit." 10 V.S.A. § 6081. The key element for determining the jurisdiction of the Board is the word "development." If the demolition of 8 Baldwin Street is development as that word is defined by the Act, then the Board has jurisdiction over the project.

Development has a number of different definitions under Act 250 depending on the type of project involved. In the case of state projects, the definition of development embodies a two-part jurisdictional test. Development is: (1) "the construction of improvements" (2) "on a tract of land involving more than 10 acres." 10 V.S.A. § 6001(3). Both parts of the definition must be met before the Board has jurisdiction over

---

[1] Person is defined as including a state agency. 10 V.S.A. § 6001(14).

a state project. The Act does not define "construction of improvements" or "involved land" but leaves them for the Board to define.

## A.

I take up first the involved land component. In reaching its decision that there was sufficient involved land the Board relied on Environmental Board Rule 2(A)(4). The pertinent part of the Rule provides the following definition of involved land:

> In the case where a state or municipal project is to be completed in stages according to a plan or it is evident under the circumstances that a project is incidental to or a part of a larger undertaking, all land involved in the entire project shall be included for the purposes of determining jurisdiction.

Rule 2(A)(4), State Land Use and Development Plans, Subchapter 1, Environmental Board Rules, *reprinted in* Titles 10–17 Vermont Regulations Annotated 460 (Fox 1980).

It should be noted that the majority opinion did not question the validity of Rule 2(A)(4) but disagreed only with its application. This is exactly where the majority opinion errs. The majority places too much emphasis on the word "plan." Act 250 nowhere mentions or requires a plan to determine involved land. This Court's definition of involved land in *Bishop's House, supra,* 137 Vt. at 153, 400 A.2d at 1021, also does not require a plan. Rule 2(A)(4), while mentioning plan as one easy method to determine involved land, does not insist on a plan but provides an alternative criterion for finding involved land, *i.e.,* evidence that a project is incident to a larger undertaking. Thus even if the capitol complex proposal does not rise to the level of a plan, which I think it does, there was more than enough evidence in the record to find that the demolition of 8 Baldwin Street was part of a larger undertaking.

While not defining involved land specifically, Act 250 provides some guidance as to what the Legislature intended. 10 V.S.A. § 6001(3) provides that "[i]n computing the amount

of land involved, land shall be included which is incident to the use such as lawns, parking areas, roadways, leaching fields and accessory buildings." Thus, in computing the acreage of involved land, at the very least, land which is "incident to the use" of the proposed project is to be included along with the acreage of the project itself.

I think Rule 2(A)(4) is well within the bounds of this definition of involved land. The Rule only seeks to include land which is actually to be developed and does not seek to extend the definition of involved land beyond the incident to use criteria. Even if that were not the case, however, involved land is not limited to the "incident to the use" test but is much broader. In *Bishop's House* this Court defined involved land in the following manner:

> [L]and is involved within the meaning of 10 V.S.A. § 6001(3) only where it is incident to the use within the meaning of that section, or where it bears some relationship to the land actually used in the construction of improvements, such that there is a demonstrable likelihood that the impact on the values sought to be protected by Act 250 will be substantially increased by reason of that relationship.

137 Vt. at 153, 400 A.2d at 1021.

Evaluated in the light of the *Bishop's House* standard of review, it is clear from the following discussion that Rule 2(A)(4) and its application in this case are "reasonably related to the purposes of the [Act]," and there are no "compelling reasons" to overturn the Board's decision on this ground. *Id.* at 150–51, 400 A.2d at 1019–20.

Relying on Rule 2(A)(4) the Board found that the acquisition and demolition of 8 Baldwin Street is but one stage in a large-scale development project, exceeding ten acres, to build a government office complex in the Capitol Complex area. This finding was amply supported. It is obvious from the record that such a plan, as that word is commonly used, exists. The majority opinion, in reaching the opposite conclusion, ignores reality and the confines of our scope of review.

The Capitol Complex Plan is far more than a planning study, a policy statement, or a pipe dream. The plan was pre-

pared at the direction of the General Assembly.[2] 29 V.S.A. § 158. The fact that 29 V.S.A. § 158 requires the State Buildings Division to "submit the plan and proposed revisions to the general assembly for approval before beginning construction or reconstruction of any building" does not affect the existence of the plan for the purpose of determining Act 250 jurisdiction. The approval language at 29 V.S.A. § 158 does not mean that the plan does not exist until approved, it simply means that the Buildings Division cannot begin construction on specific projects pursuant to the plan until the Legislature approves them. Thus, every time the Legislature approves an acquisition, construction, reconstruction, or demolition which is in conformance with the plan, it has tacitly approved the plan up to that point. In fact this has happened on a number of occasions. For example, Public Act No. 176, which approved the demolition of 8 Baldwin Street, specifically instructs and appropriates funds to the State Buildings Division to "[u]pdate the Capitol Complex Plan in accordance with Title 29, chapter 5, section 158, which shall include preliminary plans and estimates to accommodate state house expansion." Act of May 6, 1980, Pub. Act No. 176, § 1(a)(12), 1980 Vt. Acts 353, 354 (Adj. Sess.). Moreover, the demolition of 8 Baldwin Street is itself in conformance with the plan.

The movement toward fulfillment of the plan has been steady and inexorable. The Board found that a number of direct and significant acquisition, demolition, and construction activities have already been taken in furtherance of the plan. Since 1966 at least twelve separate properties have been acquired within the Capitol Complex by the state in furtherance of the plan. Since 1971, State Buildings Division has demolished or removed seven buildings in the Complex in conformance with the plan. Structures at No. 3 and No. 5 Baldwin Street, both of which are sites for part of the Stage II office building, have already been removed. Other portions of the plan which have been accomplished include:

---

[2] I think the majority's distinction among the three masterplans is obfuscatory and irrelevant. The fact remains that, regardless of what happened before, a plan was prepared in 1974 pursuant to 29 V.S.A. § 158.

— the extension of Taylor Street to Court Street,
— the renovations of the interior of the Statehouse,
— the exterior lighting around the Statehouse, and
— the installation of an electronic monitoring system in the Complex.

The director of the State Buildings Division admitted that his requests to the Legislature to demolish 8 Baldwin Street and other properties were made to make the land available in furtherance of the Capitol Complex Plan.

Nor have the State Buildings Division and the Legislature been the only parties to use the plan. In 1979 the Governor prepared his Proposed Ten Year Capital Program for the 1980's, wherein he proposed spending $14.8 million on the Stage II office building in fiscal years 1984 through 1987. Stage IIb, which is the portion encompassing 8 Baldwin Street, was recommended for fiscal years 1986 and 1987.

In the face of all this evidence, I do not see how anyone can conclude that no plan exists.

State Buildings Division argues in response that because the present plan is always subject to change and because it is quite conceivable that planned projects will never be funded, the plan should not be used to trigger Act 250 jurisdiction. While these are acknowledged contingencies, they do not negate the fact that the state does plan to construct a building in the area in question and that building is only one part of a much larger plan. The uncertainties alluded to are really no different from those facing a private developer who has long-range development plans but who secures financing for only one phase of a project at a time. In today's present climate of fluctuating interest rates, the private developer can easily spend years planning a project and yet ultimately discover that parts of the project are economically unfeasible because of the high rate on commercial loans. This financial uncertainty, however, is no basis for exempting the private developer from review when he goes ahead and commences each constituent phase of his planned project. Act 250 does not provide that the state should be treated differently.

While it is true that the long-range plans for a multi-stage project may be altered over time as the project evolves, I do not think that this fact alone is sufficient ground to exempt

the early stages of that project from Act 250 review. I agree with the majority that Act 250 requires a concrete act to trigger jurisdiction. However, in this case such a concrete step has been taken: State Buildings Division has already begun tearing down 8 Baldwin Street. I do not agree that the remainder of the plan must be so concrete. The language and purposes of the statute itself, which should be looked to in the first instance, do not support such a requirement.

The Act requires review of large-scale projects in advance of the commencement of construction. 10 V.S.A. § 6081. This requirement would be made meaningless if the Board's jurisdiction were dependent upon a finding that the later phases of the project were certain to be accomplished. The Board can never know for certain in advance whether the later stages of a project will be financed, constructed, sold, altered, or abandoned. Under Act 250 and the *Bishop's House* decision the Board does not have to sit powerless until the eleventh acre is disturbed. If a developer's actions are guided by a reasonably well-defined plan that is either disclosed to the Board or apparent under the circumstances, Rule 2(A)(4), *supra,* and the project as a whole would be subject to the jurisdiction of the Act, 10 V.S.A. § 6001(3), then jurisdiction is triggered upon commencement of development of the first stages of the project, 10 V.S.A. § 6081(a).

If this were not the case, developers, including the state, could avoid certain protections of the Act by destroying in the land clearing process certain values the Act seeks to protect, *i.e.*, historic sites, scenic or natural beauty, endangered species, necessary wildlife habitat, shorelines, and primary agricultural soils. 10 V.S.A. § 6086. The developer or the state could then present the Board with a *fait accompli* with respect to those criteria of the Act and those impacts of the project. It is hard to imagine the Legislature intended such an empty result.

Therefore, because the demolition of 8 Baldwin Street is the first step in a plan, or at the very least evidence of a larger undertaking, to develop in excess of ten acres, the "involved land" requirement of Act 250 is satisfied.

## B.

The next step is to determine if the demolition of 8 Baldwin Street is, under the present circumstances, the "construction of improvements." If it is, then the second jurisdictional requirement of the Act is met and the Board has jurisdiction. 10 V.S.A. § 6001(3).

There are two grounds on which to find that the demolition of 8 Baldwin Street is "construction of improvements" for purposes of Act 250: (1) the plain meaning of the words includes the demolition of a building in these circumstances, and (2) the Board's interpretation of "construction of improvements" as including the demolition of 8 Baldwin Street is "necessary to carry out the provisions of the Act" and is "reasonably related to the purposes of the enabling legislation." *Bishop's House, supra,* 137 Vt. at 150, 400 A.2d at 1019. Either ground is persuasive. Taking them together leads to the irrefutable conclusion that the Board's interpretation and application of "construction of improvements" must be sustained by this Court.

The State Buildings Division argues that the plain meaning of "construction of improvements" cannot include demolition because demolition is the antonym of construction. At first blush this seems persuasive, but in fact the dictionary definitions of "construction" and "improvements" are quite broad and when the words are read together as a unit in the context of the entire Act it cannot be said that the Board's interpretation and application of the phrase in the present circumstances exceeded the Board's authority. To reiterate, we cannot overturn the Board's interpretation of the Act "unless there are compelling indications that it is wrong." *Id.* at 151, 400 A.2d at 1020.

While it is true that the demolition of a particular house is the opposite of the construction of that house, it is equally true that the demolition of one house can be the first step in the construction of another. Thus demolition can logically be part of construction. The dictionary definitions clearly permit this interpretation. *Webster's* preferred definition of construction is the "[p]rocess or art of constructing." *Webster's New International Dictionary of the English Language* 572. (W. Nielson 2d ed. 1961). The most recent edition of *American*

*Heritage Dictionary* defines construction as "[t]he action or business of building." *The American Heritage Dictionary of the English Language* 156 (P. Davies paperback ed. 1980). Certainly the tearing down of one building to make way for another is part of the "process" or "business" of constructing. This is especially true in the "business" sense. Today the word construction is commonly used to mean any activity carried on by a construction company.

This interpretation is bolstered further when the definitions of the word "improvements" are added. *Webster's* defines improvement in the following manner: "1. Act, fact, or *process* of improving; as: . . . *development*; . . . 4. A valuable addition, or betterment, as a building, *clearing*, drain, fence, etc., on land . . . ." *Webster's, supra,* at 1253 (emphasis added). *"A necessary improvement* is one made to prevent deterioration of property." *Id.* (emphasis in original). *American Heritage* defines "to improve" as "[t]o increase the productivity or value of [land]." *American Heritage, supra,* at 355.

Even viewed as an isolated act, rather than as part of a plan, the demolition of 8 Baldwin Street could conceivably be considered a "construction of improvements" when the broadest interpretation of those words is applied: removing a deteriorating building can increase the value of property, and the demolition of a building is an activity which is commonly carried on by a construction company. But, when the demolition is part of a larger plan or undertaking to construct an office complex, as in this case, then it is clearly part of the process or business of constructing an improvement.

The second ground for finding that the Board's interpretation of "construction of improvements" was within its authority clearly supports the jurisdiction of the Board: the Board's interpretation and application of "construction of improvements" are "reasonably related to the purposes of the [Act]." *Bishop's House, supra,* 137 Vt. at 150, 400 A.2d at 1019. Furthermore, it is well established that a public administrative authority has both "such powers as are expressly granted by the Legislature, together with those implied as necessary for the full exercise of those granted." *New Hampshire-Vermont Physician Service* v. *Commissioner, Department of Banking & Insurance,* 132 Vt. 592, 596, 326 A.2d 163, 166 (1974).

The criteria to be considered in the Act 250 review process are set forth at 10 V.S.A. § 6086. One such factor of particular pertinence is that the development "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). A "historic site" is defined at § 6001(9) as one included in the National Register of Historic Places. Because the house at 8 Baldwin Street is on the Register, its historic significance is pertinent to the Act 250 process. This Court has recognized in dicta the appropriateness in an Act 250 review of considering the aesthetic implications of demolishing a structure in a historic district. *Bishop's House, supra,* 137 Vt. at 147, 400 A.2d at 1017–18.

If the Environmental Board is ever to be able to exercise its express authority under the Act to consider effects on historic sites, then it stands to reason that a definition of "construction of improvements" must be broad enough to include a development which begins with the demolition of a historic building. To restrict the Board from so interpreting what the Act has left undefined would be to allow developers to raze historic buildings before commencing Act 250 review.

A flexible definition of "construction of improvements" is similarly demanded by other portions of the Act. For example, 10 V.S.A. § 6086(a)(4) mandates consideration of soil erosion and the capacity of the land to hold water. 10 V.S.A. § 6086(a)(8) and (9) require some protection for wildlife habitats and agricultural and forest soils. Including within its scope work preparatory to construction, such as the clearing of land, permits the Environmental Board to accomplish its statutory duty to weigh the above criteria prior to the damage being done. Otherwise, developers could simply avoid consideration of soil erosion, water retention, and wildlife habitats by simply clearing their land first and commencing construction later. In view of the Act's purposes, I cannot believe the Legislature intended such a result.

Because the Environmental Board's interpretation and application of "involved land" and "construction of improvements" are "necessary to carry out the provisions of the Act" and "are reasonably related to [its] purposes," the Board has jurisdiction of this case. *Bishop's House, supra,* 137 Vt. at

150, 400 A.2d at 1019; *Physician Service, supra,* 132 Vt. at 596, 326 A.2d at 166.

## III.

The State Buildings Division raises two additional issues which did not need to be addressed by the majority because of the result they reached. Reaching a different result, it is necessary that I comment briefly on them.

The first issue is whether the appropriations bill for the demolition of 8 Baldwin Street, Public Act No. 176, *supra,* excludes the project from Act 250 jurisdiction. 10 V.S.A. § 6081 specifically requires that state agencies obtain a permit before commencing development. The appropriations bill, by contrast, merely appropriates one large sum of money for 13 different projects. Section 10 of the Act gives authority to postpone any of the authorized projects and to shift unexpended project balances to other projects. Thus the bill hardly constitutes such an explicit mandate to tear down 8 Baldwin Street as would exempt it from Act 250. One plausible interpretation, in fact, is that the authorization includes sums to pursue the demolition by beginning at the beginning—with the permit process.

The second issue is whether the Capitol Complex Commission, 29 V.S.A. §§ 181–185, has exclusive jurisdiction of development within the Capitol Complex. This question must be answered in the negative for several reasons. First, as noted above, Act 250 requires every person, including a state agency, 10 V.S.A. § 6001(14), to get a permit before commencing development. 10 V.S.A. § 6081(a). Secondly, the jurisdiction of the Board and the Commission, while overlapping, is not identical. The Board is directed to consider many more issues than the Commission. Compare 10 V.S.A. § 6086 with 29 V.S.A. §§ 181, 183. Nothing suggests that the Legislature intended to foreclose consideration of the Act 250 criteria by creating the Capitol Complex Commission. Finally, Act 250 specifically contemplates the existence of overlapping jurisdiction as to permits. 10 V.S.A. § 6082. So there is no reason to conclude that the creation of the Capitol Complex Commission was intended to insulate development activities within the capitol complex area from Act 250 review.

For these reasons I would affirm.

I am authorized to state that Mr. Justice Underwood concurs in this dissent.