Committee to Save the Bishop's House, Inc.; Committee to Save the Bishop's House, Sigma Nu Fraternity and Thomas Sachs; Vermont Environmental Board, Intervenor v. Medical Center Hospital of Vermont, Inc.

[400 A.2d 1015]

No. 264-78

Present: Barney, C.J., Daley, Larrow, Billings and Hill, JJ.

Opinion Filed April 3, 1979

144

H. *Thomas Andersen* of *Hoff, Wilson, Jenkins & Powell,* Burlington, for Plaintiffs.

*M. Jerome Diamond,* Attorney General, and *Benson D. Scotch,* Assistant Attorney General, Montpelier, for Intervenor.

*Spencer R. Knapp* of *Dinse, Allen & Erdmann,* Burlington, for Defendant.

**Billings, J.** Medical Center Hospital of Vermont, Inc. (the Hospital) appeals from an order of the Chittenden Superior Court enjoining the demolition or dismantling of the building at 52 South Williams Street in the City of Burlington, known as the Bishop's House, and enjoining any related work directed toward the construction of a parking lot on the premises, until the Hospital obtains a permit authorizing such acts pursuant to 10 V.S.A. §§ 6001–6091, Vermont's Act 250. We conclude that the Hospital's proposal to raze the Bishop's House and construct a parking lot in its place does not fall within the terms of Act 250, and dissolve the injunction.

Act 250 is to be distinguished from the bulk of traditional zoning and subdivision legislation, which is merely state enabling legislation permitting regulation of land use on a local or regional level. See 24 V.S.A. §§ 4401–4493. Act 250 establishes a mechanism for review of certain land use activity at the state level. It supplements pre-existing legislation authorizing local zoning and subdivision control. Act 250 purports neither to reach all land use changes within the state, nor to supersede local land use control efforts. Thus, where local regulation is in effect, a person proposing to subdivide or develop might have to gain approval both at the local and the state levels, see 10 V.S.A. § 6082, or might need local approval only.

If a project is one that Act 250 subjects to state level review, it cannot go forward without a permit from a dis-

trict environmental commission. 10 V.S.A. §§ 6026, 6081–6091. The district environmental commission must determine that a project will not result in undue or unreasonable adverse effects on a number of factors, set out in 10 V.S.A. § 6086, before it can issue a permit. These include water and air quality, soil stability, availability of educational services, availability of municipal or governmental services, and scenic and natural beauty. Significantly, the district commission must find that the project will not have an undue adverse effect on historic sites. 10 V.S.A. § 6086(a)(8).

Whether a district commission could or would make the findings required as a precondition to the issuance of a permit becomes irrelevant, however, if the project is one that Act 250 does not control. The preliminary point in each case, and the center of this controversy, is the determination of the district commission's jurisdiction to review the project.

The Hospital is the product of the merger, in 1967, of two previously independent hospitals, the Mary Fletcher Hospital and the DeGoesbriand Memorial Hospital, now called the Mary Fletcher Unit and the DeGoesbriand Unit. The Mary Fletcher Unit, consisting of hospital buildings, adjacent parking facilities, and lawns, occupies an area of 26.7 acres, all owned by the Hospital. The DeGoesbriand Unit, consisting of buildings, adjacent parking areas, lawns, and the Bishop's House lot, occupies an area of 5.9 acres. The two units occupy noncontiguous tracts, being separated by a distance of one-half mile at their nearest points. The Hospital acquired title to most of the presently existing parking area on the DeGoesbriand tract and to the Bishop's House lot only in March of 1977. The Bishop's House lot, comprising 1.44 acres, was bought so that the Hospital could expand its parking facilities. The Bishop's House is within a district included in the National Register of Historic Sites.

Subsequent to the purchase, the Hospital took preliminary steps to implement a plan to demolish the Bishop's House and construct a parking lot in its place by securing the necessary demolition permit from the City of Burlington, and the approvals of the City Planning Commission and the Historic Review Subcommittee of the Design Review Committee of the Burlington Planning Commission.

On October 17, 1977, when the Hospital was prepared to execute its plan, an action was commenced in superior court by the appellees, Committee to Save the Bishop's House (the Committee) and Sigma Nu Fraternity, to block demolition of the Bishop's House until the Hospital had obtained or been denied an Act 250 permit. The Committee alleged its interest in preserving the Bishop's House for its cultural, historic, architectural, and aesthetic value. These plaintiffs and the Committee's successor, the Committee to Save the Bishop's House, Inc., have stressed that "to demolish the Bishop's House would be to create a gaping hole in the cohesive streetscape of South Williams Street and to cause irreversible damage to the historic aspects of the street, the Historic Site District and the historic aspects of the city of Burlington." These allegations would be of relevance in any proceeding for a permit before the district environmental commission, but are irrelevant to the determination of the commission's jurisdiction over the project.

The Vermont Environmental Board was granted leave to intervene on October 21, 1977, and a temporary restraining order was filed by the court on the same day. A preliminary injunction issued on October 24, 1977, to remain in effect by its terms until the Hospital obtained either an Act 250 permit or a declaratory ruling that none was required from the district environmental commission or from the Vermont Environmental Board.

The Environmental Board held a hearing on the matter, and ruled that the Hospital was required to secure an Act 250 permit before demolishing the Bishop's House. The Hospital thereupon sought and obtained permission from the superior court to take an interlocutory appeal from the preliminary injunction order, V.R.A.P. 5(b)(1), and prosecuted appeals to this Court from that order and from the Environmental Board's declaratory ruling. The appeals were consolidated pursuant to a stipulation of the parties.

We vacated the declaratory ruling of the Environmental Board for procedural reasons, and dissolved the preliminary injunction on the grounds that the superior court had erred in waiving security without a showing of legally sufficient cause, V.R.C.P. 65(c), and in failing to determine itself whether Act 250 applied to the proposed demolition before

granting what amounted to final injunctive relief. We remanded the cause to the superior court for further proceedings. *Committee to Save the Bishop's House* v. *Medical Center Hospital of Vermont, Inc.*, 136 Vt. 213, 388 A.2d 827 (1978).

Upon remand, the private plaintiffs and the Environmental Board, by separate motions, sought preliminary injunctions in the cause. Hearing was held, and the superior court granted preliminary injunctive relief to the Vermont Environmental Board, without requiring security. The Environmental Board, as an agency of the State, is exempted from the requirement of furnishing security. V.R.C.P. 65(c). The court's order was supported by findings of fact and conclusions of law, wherein the court concluded that Act 250 applied to the Hospital's project. The court enjoined the proposed demolition and related activity until such time as an Act 250 permit had been obtained. The private plaintiffs' motion for a preliminary injunction was subsequently dismissed for failure to furnish security in the amount of $80,000 within a time specified.

On July 31, 1978, all parties stipulated to the decision of the case on the merits and entry of final judgment without further hearing. On August 11, 1978, the superior court entered an order adopting the findings and conclusions set forth in the preliminary injunction order of July 7, 1978, in a final decree and granting permanent injunctive relief.

The determination of this controversy turns on the construction to be given 10 V.S.A. § 6001(3), defining "development" for purposes of Act 250. If what the Hospital plans to do is "development" within Act 250, then the district environmental commission has jurisdiction to review the Hospital's plan in the light of the criteria contained in 10 V.S.A. § 6086, and either grant or deny a land use permit. 10 V.S.A. § 6081(a). If razing the Bishop's House and replacing it with a parking lot is not "development" as defined, then construction can proceed without any review or assessment under Act 250. The definition provides in full:

When used in this chapter:

. . . .

(3) "Development" means the construction of improvements on a tract or tracts of land, owned or controlled

by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes. "Development" shall also mean the construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality which has not adopted permanent zoning and subdivision bylaws. The word "development" shall mean the construction of housing projects such as cooperatives, condominiums, or dwellings, or construction or maintenance of mobile homes or trailer parks, with 10 or more units, constructed or maintained on a tract or tracts of land, owned or controlled by a person, within a radius of five miles of any point on any involved land. The word "development" shall not include construction for farming, logging or forestry purposes below the elevation of 2500 feet. The word "development" also means the construction of improvements on a tract of land involving more than 10 acres which is to be used for municipal or state purposes. In computing the amount of land involved, land shall be included which is incident to the use such as lawns, parking areas, roadways, leaching fields and accessory buildings. The word "development" shall not include an electric generation or transmission facility which requires a certificate of public good under section 248 of Title 30. The word "development" shall also mean the construction of improvements for commercial, industrial or residential use above the elevation of 2500 feet.

The Hospital argues that its project, which would be carried out in Burlington, a municipality that has adopted permanent zoning and subdivision bylaws, does not involve more than 10 acres of land for purposes of the Act, that any activity it plans to undertake will be for neither a commercial nor an industrial purpose, and that, even assuming the building of the parking lot would trigger the permit requirement of Act 250, the mere demolition of the Bishop's House can not, since it is not the "construction of improvements." Because we conclude that the Hospital must prevail on its first argument, we do not reach the latter two.

The actual demolition and construction in issue will be virtually confined to the Bishop's House lot, comprising 1.44 acres. The new parking facility will primarily serve the DeGoesbriand Unit, which occupies a tract of 5.9 acres, although the record discloses that it may be used incidentally in connection with services rendered at the Mary Fletcher Unit. The Hospital owns well in excess of 10 acres within a radius of five miles, since the Mary Fletcher Unit, located nearby, occupies 26 acres. The jurisdiction of the district environmental commission over the project under Act 250, and the propriety of the ruling below, depend on whether the Mary Fletcher Unit is "involved" with the demolition and construction on the Bishop's House lot within the meaning of the Act.

In concluding that it is, the superior court relied heavily on Environmental Board Rule 2(F) and the "functional approach" it carries to the definition of "involved land." The rule states:

> "Involved land" includes all land within a radius of five miles which is part of, closely related or contiguous to or will or may be affected by the development, and which is owned or controlled by a person including, but not limited to, interests created by trusts, partnerships, corporations, cotenancies, easements and contracts.

The court concluded that the Mary Fletcher Unit "is closely related to and may be affected by" the proposed parking lot, based on its finding of an interrelationship between the Mary Fletcher and the DeGoesbriand Units.

 At the time this rule was promulgated, the Environmental Board was required by 10 V.S.A. § 6025 to adopt rules to "carry out the provisions of this chapter." It is a fundamental principle in the judicial review of administrative action that, where the empowering provisions of a statute authorize an agency to make such rules and regulations as may be necessary to carry out the provisions of the Act, the validity of such rules or regulations will be sustained so long as they are reasonably related to the purposes of the enabling legislation. *Mourning* v. *Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973). It is a "venerable principle that

construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co.* v. *Federal Communications Commission*, 395 U.S. 367, 381 (1969).

■ Here there are such compelling indications. Although we are pointed to an earlier opinion of this Court indicating that the purposes of the Act are broad, *In re Preseault*, 130 Vt. 343, 348, 292 A.2d 832, 836 (1972), a careful reading of the statute as a whole, and of section 6001(3) in particular, convinces us that it was the Legislature's intent to involve the state in land use decisions in cases where a permanent mechanism exists for their review at the municipal level only where activity on a very major scale is planned. According to the statutory scheme, any construction for commercial or industrial purposes on more than one acre, within a municipality which has not adopted permanent zoning and subdivision by-laws, will trigger the permit requirement of the Act, and thus state involvement, whereas such activity involving 9 acres, to be carried out in any other area, will not require a land use permit from the state. 10 V.S.A. § 6001(3). The implication is clear that the Legislature sought to mandate a second layer of review of proposed land use decisions, imposing substantial additional administrative and financial burdens on an applicant, and possibly interfering to some extent with local control of land use decisions, only where values of state concern are implicated through large-scale changes in land utilization.

■ The wording of Environmental Board Rule 2(F) is too vague in that it permits, perhaps even encourages, a construction of "involved land" that authorizes the district environmental commissions to assert Act 250 jurisdiction where the plain policy of the Act indicates that the fate of a project should be left to local decision. The rule goes beyond mere interpretation or implementation of the statute, and compromises the substantive requirements of Act 250. See *In re Petition of Allied Power & Light Co.*, 132 Vt. 354, 360, 321 A.2d 7, 11 (1974). We hereby declare the rule invalid. It thus cannot support the superior court's liberal approach in applying the statute.

■ The superior court was not otherwise authorized to so generously construe Act 250's jurisdictional threshold provision. While the Legislature possesses a great deal of authority, by virtue of the police power, to involve state government intimately in land use decisions anywhere in this state, the function of a court of law is not to construe the Legislature's acts as going to the limits of its power in each instance. The court's true function is to give effect to the legislative intent, and in this endeavor, we are guided by rules of general applicability, evolved through long judicial experience. One of these is that legislation in derogation of common law property rights will be strictly construed. *Glabach* v. *Sardelli,* 132 Vt. 490, 494, 321 A.2d 1, 4 (1974) ; *City of Rutland* v. *Keiffer,* 124 Vt. 357, 360, 205 A.2d 400, 402 (1964).

■ Here there is an additional reason for refraining from an expansive reading of Act 250's jurisdictional provision. This is the prior existence of legislation authorizing the municipalities of this state to adopt zoning and subdivision bylaws. 24 V.S.A. §§ 4401–4493. The Legislature has explicitly precluded the possibility that an Act 250 permit might act to supersede or replace the requirements of municipal land use regulations. 10 V.S.A. § 6082. We will not presume an intention on the part of the Legislature in enacting Act 250 to dilute the authority delegated to the municipalities to regulate land use decisions. A liberal construction of "involved land" would have just such an effect, by providing for too frequent state level review of local permit decisions.

■ With these principles in mind, we approach the task of construing the "involved land" provision of 10 V.S.A. § 6001(3). It is clear that there is no warrant for restricting the term to the acreage actually used in the construction of improvements. Such an interpretation ignores the distinction drawn by the Legislature between construction "*on* more than one acre of land within a municipality which has not adopted permanent zoning and subdivision bylaws," and construction "*involving* more than 10 acres of land within a radius of five miles of any point on any involved land." (Emphasis supplied.) Such an interpretation is also inconsistent with the concept of land that is "incident to the use," which land is

required to be included in computing the amount of land involved.

The statute does not define "land . . . which is incident to the use," but instead relies on several examples, these being lawns, parking areas, roadways, leaching fields, and accessory buildings. Giving the statute a common sense construction, we conclude that the Legislature did not intend to limit the concept of land which is incident to the use to the enumerated examples. We also conclude that, in mandating that land incident to the use be *included* in computing the amount of land involved, the Legislature intended to describe a component of involved land, and not to limit that concept to land which is incident to the use. To conclude otherwise would render one concept or the other redundant, and would ignore the plain meaning of the word "include," which the Legislature used to express its will. This Court must presume that all language in a statute was drafted advisedly, *State* v. *Racine,* 133 Vt. 111, 114, 329 A.2d 651, 653–54 (1974), and that the plain ordinary meaning of the language used was intended, *Standard Register Co.* v. *Commissioner of Taxes,* 135 Vt. 271, 273, 376 A.2d 41, 42 (1977).

It remains to apply this reading of involved land in the light of the obvious purpose of the permit requirement of Act 250. This purpose is to subject all "development" to scrutiny at the district environmental commission level to assure that any adverse impacts on the values described in 10 V.S.A. § 6086 will not be undue, when considered against the benefits of the development. We conclude that land is involved within the meaning of 10 V.S.A. § 6001(3) only where it is incident to the use within the meaning of that section, or where it bears some relationship to the land actually used in the construction of improvements, such that there is a demonstrable likelihood that the impact on the values sought to be protected by Act 250 will be substantially increased by reason of that relationship.

On the record before us, no such relationship appears between the land to be actually used in the construction of improvements, amounting to 1.44 acres, and the Mary Fletcher Unit, which occupies an area in excess of 26 acres. While it

may very well be that the entire 5.9 acre DeGoesbriand tract is involved land within the meaning of Act 250, this is not properly for our determination, since an affirmative answer would not alter the result. This being so, we are not called upon to decide the effect, if any, on the determination of Act 250 jurisdiction of a transaction effected after the commencement of this litigation, whereby the Hospital conveyed 2.6 acres of the DeGoesbriand tract, comprising the hospital buildings and the immediately surrounding lands, to the University of Vermont, taking back a lease on 61% of the space in the DeGoesbriand buildings.

The superior court correctly noted in its findings and conclusions supporting its injunction that the question of whether the project involves more than 10 acres of land "depends largely upon the relationship, if any, of the proposed project to the Mary Fletcher Unit." The court found that the DeGoesbriand Unit and the Mary Fletcher Unit are interrelated in their operations and operate under a single management, and adequately supported its conclusion that there is an interrelationship between the two units. However, the court did not explore the relationship between the proposed parking lot and the Mary Fletcher Unit. The court's conclusions that the parking lot will serve the entire hospital complex, and that the Mary Fletcher Unit is closely related to and may be affected by the parking lot, are legally insufficient to support Act 250 jurisdiction, especially in light of the court's finding that the parking lot is designed primarily to serve the DeGoesbriand Unit.

*Reversed, injunction dissolved, and cause remanded for a hearing on damages, if any, incurred by reason of the first preliminary injunction in favor of the plaintiffs Committee to Save the Bishop's House, Sigma Nu Fraternity and Thomas Sachs, if the defendant be so advised.*