2006 VT 8

# In re Appeal of S-S Corporation/Rooney Housing Developments

[896 A.2d 67]

No. 04-080

Present: Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.),
Specially Assigned

Opinion Filed January 13, 2006

*Robert A. Gensburg* of *Gensburg, Atwell & Broderick,* St. Johnsbury, for Appellant.

*William H. Sorrell,* Attorney General, *Kevin Leske,* Assistant Attorney General, and *Jill K. Reymore,* Law Clerk (On the Brief), Montpelier, for Amicus Curiae State of Vermont.

¶ 1. **Skoglund, J.** S-S Corporation[1] appeals an Environmental Board declaratory ruling requiring it to obtain an Act 250 permit for two houses it constructed for use as residential care facilities. The Board concluded the construction of the houses was "development" under 10 V.S.A. § 6001(3)(A)(iv) and Environmental Board Rule 2(A)(1)(c) because together they consist of ten or more units and are "commercial dwellings" under Rule 2(M). S-S Corp. appeals both of these conclusions. We affirm the Board's rulings.

¶ 2. Yvonne and Catherine Rooney operate residential care homes for physically and mentally disabled adults. Prior to the construction of the project at issue, they maintained a facility, known as the Washington Street home, in which they provided care and living quarters for thirteen adults. Faced with costly upgrades and residents who found it increasingly difficult to navigate the two-story home, the Rooneys sought and received funding from the United States Department of Housing and Urban Development (HUD) to build two new group homes, the Owen House and the Harvey House (the Houses).

¶ 3. The Houses are approximately three-and-a-half miles apart and are seven-bedroom, ranch-style homes intended to house eight residents who pay rent or fees. Staff members are on duty twenty-four hours a day, seven days a week; no staff or owners live in either House. Visiting nurses provide nursing care, and Catherine Rooney is authorized to distribute medications. The average length of stay for residents in the Rooneys' homes is twenty years, and at the time of the Envi-

---

[1] S-S Corporation controls the nonprofit corporations the Owen House, Ltd. and the Harvey House, Ltd., which each received federal funding to develop residential care facilities to house disabled adults. The original request for a declaratory ruling from the Environmental Board was made by S-S Corp./Rooney Housing Developments; the Owen House, Ltd. and the Harvey House, Ltd. appealed the Board ruling to the Vermont Supreme Court. For consistency with the Environmental Board ruling and for ease of composition, we refer to appellant here as S-S Corp.

ronmental Board decision in 2003, residents in the Rooneys' homes had lived there for between two and thirty-two years.

¶ 4. After funding for the Houses was secured and construction of the Owen House had begun, the Assistant District Coordinator for District Environmental Commission #4 issued a jurisdictional opinion holding that the Houses were a housing project requiring Act 250 approval under 10 V.S.A. § 6001(3)(A)(iv). S-S Corp. appealed the opinion to the Environmental Board, which agreed with the jurisdictional opinion in a November 2003 decision. S-S Corp. sought reconsideration of the Board's ruling, and the Board reaffirmed its decision in February 2004. Specifically, the Board ruled that the construction fell within the definition of "development" under 10 V.S.A. § 6001(3)(A)(iv) and Environmental Board Rule 2(A)(1)(c) because: (1) there were a combined fourteen rooms between the two Houses, thereby exceeding the ten-unit requirement; and (2) the construction met Rule 2(M)'s definition of a "commercial dwelling." This appeal followed.

¶ 5. This Court reviews Environmental Board decisions with deference. Upon review of administrative decisions generally, this Court presumes a given administrative action is valid and correct absent clear and convincing evidence to the contrary. *In re Devoid*, 130 Vt. 141, 148, 287 A.2d 573, 577 (1972). The Court will sustain Environmental Board interpretations of Act 250 "[a]bsent compelling indications of error," and defers to the Board's "interpretations of Act 250 and its own rules, and to the Board's specialized knowledge in the environmental field." *In re Wal\*Mart Stores, Inc.*, 167 Vt. 75, 79, 702 A.2d 397, 400 (1997). The decisions of the Environmental Board concerning questions of fact are conclusive if supported by "substantial evidence on the record as a whole." 10 V.S.A. § 6089(c). In this context, " 'substantial evidence' . . . is evidence properly before the Board that is relevant and which a reasonable person might accept as adequate to support a conclusion." *In re Denio*, 158 Vt. 230, 236, 608 A.2d 1166, 1170 (1992). We will affirm the Board's legal conclusions if they are "rationally derived from a correct interpretation of the law and findings of fact based on substantial evidence." *In re BHL Corp.*, 161 Vt. 487, 490, 641 A.2d 771, 773 (1994).

¶ 6. The dispute in this case centers on whether the Houses are "development" under § 6001(3)(A)(iv) and Rule 2(A)(1)(c). Section 6001(3)(A)(iv) defines development as "[t]he construction of housing projects such as cooperatives, condominiums, or dwellings . . . with 10 or more units, constructed or maintained on a tract or tracts of land, owned or controlled by a person, within a radius of five miles . . . within

any continuous period of five years." The definition of development in the Environmental Board Rules is nearly identical: "[t]he construction of a housing project or projects such as cooperatives, apartments, condominiums, detached residences, ... or commercial dwellings with ten or more units constructed or maintained on a tract or tracts of land owned or controlled by a person within a radius of five miles." Environmental Board Rule 2(A)(1)(c), 6 Code of Vermont Rules 12 003 001-6 (effective January 12, 2004, and identical to version effective January 15, 2003). The rules define a commercial dwelling as "any building or structure ... including but not limited to ... rooming houses, nursing homes ... and other places for the accommodation of people, that is intended to be used and occupied for human habitation on a temporary or intermittent basis, in exchange for a payment of a fee."[2] Environmental Board Rule 2(M), 6 Code of Vermont Rules 12 003 001-11 (effective January 12, 2004, and identical to version effective January 15, 2003).

¶ 7. There is no dispute that the Houses were built within a five-year period, are located within five miles of one another, and were intended for human habitation in exchange for a fee. Therefore, at issue is whether: (1) the Board correctly defined the term "unit" such that the Houses together contain more than ten housing units; and (2) the Board properly determined that the Houses are commercial dwellings under Rule 2(M).

I.

¶ 8. First, we affirm the Board's decision to define a "unit" as a bedroom in this case. S-S Corp. argues that defining "unit" as a bedroom defies the plain meaning of the word and is inconsistent with the application of the term to other types of projects. The State argues that the definition varies depending upon the space being rented or sold and that the space being rented in a residential care facility is the bedroom. Significantly, although the parties proffer different constructions of the word "unit," they both acknowledge, correctly, that the meaning will vary according to the type of building under consideration.

---

[2] In 1985, the Legislature, in unambiguous terms, ratified all Board rules relating to the administration of Act 250. *In re Barlow*, 160 Vt. 513, 521, 631 A.2d 853, 858 (1993). Therefore, the Board's Act 250 rules have "the same effect as ... any law passed by the Legislature in the first instance." *Id.* (quotations omitted).

¶ 9. It is unsurprising that the meaning of a term undefined by statute or rule will vary depending on the context in which the term is used, and that the Board's discretion includes the ability to define a statutory term with reference to its context. This follows because where a term is not defined by rule or statute, we accept the interpretation of the Board, the administrative agency responsible for the implementation of Act 250, absent compelling error. *In re Rusin*, 162 Vt. 185, 189, 643 A.2d 1209, 1211 (1994). In addition, this Court has recognized that Act 250 decisions are "inherently fact-bound and difficult to reduce to a straightforward test," *Sec'y, Agency of Natural Res. v. Short*, 165 Vt. 277, 281, 682 A.2d 484, 486 (1996), and that the outcome of such decisions often cannot be "preordained by an inflexible definition" of a term, *In re Rusin*, 162 Vt. at 190, 643 A.2d at 1211-12.

¶ 10. For example, in *In re Rusin*, the Board was required to determine whether an access roadway qualified as a "road" under Environmental Board Rule 2(A)(6), which extends Act 250 jurisdiction to "'[t]he construction of improvements for a road or roads.'" 162 Vt. at 188, 643 A.2d at 1210 (quoting Rule 2(A)(6)). In affirming the Board's interpretation, we recognized that because the terms "road" and "driveway" were undefined by rule or statute, "a reasonable measure of discretion inheres in the determination of what qualifies as a road" under Rule 2(A)(6). *Id.* at 190, 643 A.2d at 1212; see also *Short*, 165 Vt. at 281, 682 A.2d at 485-86 (reaffirming *In re Rusin*); *In re Spring Brook Farm Found., Inc.*, 164 Vt. 282, 288-89, 671 A.2d 315, 319-20 (1995) (ruling that indirect exchange between the developer, who provided facilities to children, and contributors, who gave donations, constituted a "commercial purpose" in accordance with Rule 2(L), and stating that "[t]he term 'commercial' ... can have many different meanings depending on the context in which it is used.").

¶ 11. Further, the Board's determination that a bedroom was a housing unit in the current case is consistent with its previous rulings. See, e.g., *In re Marlboro Coll.*, Dec. Rul. #24 (July 26, 1973) (ruling that six cottages intended to house four students each comprised more than ten units together and therefore required an Act 250 permit); *In re Burke Acad.*, Dec. Rul. #6 (Apr. 23, 1973) (ruling that a housing facility intended to house sixteen students and one faculty family consisted of "more than ten dwelling units" and required an Act 250 permit). Similarly, in this case, the Board based its definition of the term "unit" on the space being rented by each resident — a bedroom. Thus, the Board properly exercised its discretion in defining the term "unit."

¶ 12. In support of its contention that the Board erred in interpreting the term "unit," S-S Corp. cites federal definitions from the Internal Revenue Code and the Cranston-Gonzalez National Affordable Housing Act (under which S-S Corp. received funding to construct the homes). We agree with the Board that federal definitions taken from statutes concerned with taxation and providing affordable housing for disabled persons are of little help in the current context. Act 250 was enacted "to protect and conserve the lands and the environment of the state and to insure that these lands and environment are devoted to uses which are not detrimental to the public welfare and interests," and it gave the Environmental Board and district environmental commissions the authority "to regulate the use of lands." 1969, No. 250 (Adj. Sess.), § 1. We have previously stated that terms in Act 250 rules must be viewed "within the context of a land use statute, not as a tax statute or trade regulation." *In re Spring Brook Farm Found.*, 164 Vt. at 289, 671 A.2d at 320. Thus, the Board was correct in declining S-S Corp.'s invitation to import a definition from federal income tax and housing laws because those laws do not share Act 250's primary goal of land protection and conservation.

¶ 13. S-S Corp. argues that where there is ambiguity in the language of a property regulation, the Court must construe the language in favor of the property owner, citing *Secretary, Vermont Agency of Natural Resources v. Handy Family Enterprises*, 163 Vt. 476, 481-82, 660 A.2d 309, 312-13 (1995). The Legislature granted to the Board the authority to adopt and interpret rules concerning Act 250. 10 V.S.A. § 6025. As we have noted, some Board determinations are inherently fact-based and do not easily fall within "inflexible definitions." *In re Rusin*, 162 Vt. at 190, 643 A.2d at 1212. We will not equate a grant of agency discretion with ambiguity, nor will we afford to appellant a presumption of ambiguity where the outcome of a determination depends to some extent upon agency discretion that has been conferred by statute.

¶ 14. We conclude that the Board's interpretation of the term "unit" is reasonable and does not reflect any compelling error by the Board. Accordingly, we affirm its conclusion that the two Houses together, which have seven bedrooms each, contain greater than ten units.

## II.

¶ 15. Next, we turn to the Board's ruling that the Houses are "commercial dwellings." Under Rule 2(M), a commercial dwelling is any building or structure that: (1) is for the accommodation of people;

(2) is intended for habitation on a temporary/intermittent basis; and (3) provides facilities in exchange for a payment or fee. Rule 2(M) includes nursing homes and rooming houses in a nonexhaustive list of examples of commercial dwellings. Because it is undisputed that the Houses will be used for the accommodation of people and that the facilities will be provided in exchange for a fee or rent, the issue is whether the Board properly concluded that the Houses are intended for use on a temporary or intermittent basis. In light of the deferential standard of review this Court applies when reviewing the Board's interpretation and application of its rules, *In re Woodford Packers, Inc.*, 2003 VT 60, ¶ 4, 175 Vt. 579, 830 A.2d 100 (mem.), as well as this Court's recognition that, in enforcing Act 250, the Board's primary concern must be the environmental impact of the proposed development, *In re Spring Brook Farm Found.*, 164 Vt. at 287, 671 A.2d at 318, we affirm the Board's conclusion that the Houses are commercial dwellings.

¶ 16. Under the applicable standard of review, see *supra*, ¶ 5, we find no compelling indications of error warranting reversal of the Board's decision. In applying Rule 2(M) here, the Board correctly recognized that Act 250 "requires a focus on *the impact of the land use*, not the nature of the institutional activity." *In re Spring Brook Farm Found.*, 164 Vt. at 287, 671 A.2d at 318. (Emphasis added.) To that end, "the proper starting point for determining Act 250 jurisdiction is the actual use of the land, not necessarily the overall purpose of a development scheme." *In re BHL Corp.*, 161 Vt. at 490, 641 A.2d at 773. Accordingly, the Board's interpretation of Rule 2(M) must, first and foremost, effectuate Act 250's goal of preventing "usages of the lands and the environment which may be destructive ... and which are not suitable to the demands and needs of the people of the state of Vermont." 1969, No. 250 (Adj. Sess.), § 1.

¶ 17. Here, the Board concluded that the Houses fit Rule 2(M)'s definition of a commercial dwelling by focusing on "the character of such homes as a general group of dwellings," not on the "subjective particulars that may result from their operation." As the Board explained, it considered "the aspects of the Harvey House and the Owen House that are relevant to Act 250 and ask[ed] whether the type of construction and occupation at issue in this matter is typical of the sorts of housing described in Rule 2(M)." By doing so, the Board remained faithful to its duty to look to the actual use of the land as the touchstone of its Act 250 jurisdictional analysis. To conclude otherwise based on either the operators' intent to maintain a stable group of residents or the desire of the residents to remain long-term would

undercut Act 250's mandate to assess any proposed development primarily in terms of its impact on the land. That the Rooneys have created an environment that nurtures familial feelings and long-term relationships among residents and between residents and caregivers is laudable. But "Act 250 speaks to land use and not to the particular institutional activity associated with that land use; to exclude [an organization] from the provisions of Act 250 simply because of [the nature of its services] could not be justified on environmental grounds." *In re Baptist Fellowship of Randolph, Inc.*, 144 Vt. 636, 639, 481 A.2d 1274, 1276 (1984).

¶ 18. Moreover, the Board's conclusion that the Houses fit Rule 2(M)'s definition is supported by the record, and thus admits of no compelling indications of error. The Board reached its conclusion for two reasons: (1) "some residents occupy the Houses temporarily, leaving and returning intermittently, as their needs require"; and (2) the Houses resemble nursing homes for purposes of Act 250 review. Focusing on the first, the Board found that some residents do leave the Rooneys' care for periods of time, and that, of those, some return and some do not. In addition, the Board found that some residents have other residences. As laid out in the Board's ruling on S-S Corp.'s motion to alter, those findings both have support in the record — specifically, the deposition testimony of Yvonne Rooney. Thus, those findings are supported by "substantial evidence" within the meaning of 10 V.S.A. § 6089(c) because they rest on relevant evidence that was properly before the Board and that a reasonable person might accept as adequate support. *In re Wal\*Mart Stores*, 167 Vt. at 80, 702 A.2d at 400-01. Those findings, in turn, support the Board's conclusion that the Houses are commercial dwellings. Additionally, there is no dispute that S-S Corp. will accept new residents when vacancies occur.

¶ 19. In asserting that the Board's and the majority's reasoning concerning the "subjective particulars" of the Houses is inconsistent, the dissent argues that the facts that "some residents leave the care of the S-S Corp. homes for periods of time and some of those do not return" are "irrelevant because they describe any residency of any type." *Post*, ¶ 33 & n.7. As the Board noted, however, Rule 2(M) specifically exempts "conventional residences" from its definition of a commercial dwelling, so it is unclear how the dissent's comparison of the Houses to "any residency of any type" advances its analysis.

¶ 20. We recognize there is some tension in the Board's decision between, on the one hand, the Board's duty to focus on the impact that the proposed development will have on the land and not on the specifics

of the services provided or the service providers and recipients and, on the other, the "temporary or intermittent" language in Rule 2(M). Given the discretion the Board enjoys in interpreting its own rules, it was within the Board's purview to resolve that tension. And it did so appropriately in light of Act 250's goals, by refusing to base its decision on the "identity or the specific characteristics or attributes" of the operators and users of the Houses. In other words, while we acknowledge that there is some surface appeal to the argument that the lengthy average tenure of the residents precludes the Houses from fitting Rule 2(M)'s definition of a commercial dwelling, the Board correctly looked beneath that surface to the land-use impact of the proposed development and the "character of such homes as a general group." For example, the Houses, and other facilities like them, exist to provide an array of services to their residents, not merely to collect rents in exchange for living space. Accordingly, we affirm the Board's conclusion that the Houses fit Rule 2(M)'s definition of a commercial dwelling.

¶ 21. In further support of its argument that the Houses should be treated as single-family residences, not commercial dwellings, S-S Corp. cites cases from other jurisdictions that address the status of group homes under zoning ordinances and restrictive covenants. For example, the Nebraska Supreme Court held that a group home for five mentally retarded women and their house parents complied with a restrictive covenant limiting lot use to "residential purposes" with only one "single family dwelling," because the group home operated as "a permanent residence intended to allow [the] ... women to lead fuller and more normalized lives in the community than would be possible in an institution." *Knudtson v. Trainor*, 345 N.W.2d 4, 5-6 (Neb. 1984) (quotations omitted); see also *Linn County v. City of Hiawatha*, 311 N.W.2d 95, 99-100 (Iowa 1981) (holding that foster home met municipal zoning code's definition of a single-family home, where code defined "family" as "(o)ne or more persons occupying a dwelling and living as a single housekeeping unit" (quotations omitted)); *Costley v. Caromin House, Inc.*, 313 N.W.2d 21, 24-26 (Minn. 1981) (ruling that a group home was a single-family residence in conformance with restrictive covenant allowing construction of "[o]nly one dwelling and one garage" and local zoning ordinance permitting "one and two-family dwelling groups" (quotations omitted)). At the heart of *Knudtson* and the other cases cited by S-S Corp. is the application of restrictive covenants and zoning ordinances that threaten to exclude group homes altogether. Yet, in the case at bar, no such issue exists. The Harvey and Owen

Houses are not threatened by exclusionary zoning because the Board's decision requires only that the Houses conform with land-use standards set forth by Act 250. And, as we have observed:

> Act 250 is to be distinguished from the bulk of traditional zoning and subdivision legislation, which is merely state enabling legislation permitting regulation of land use on a local or regional level. See 24 V.S.A. §§ 4401-4493. Act 250 establishes a mechanism for review of certain land use activity at the state level. It supplements pre-existing legislation authorizing local zoning and subdivision control.

*Comm. to Save the Bishop's House, Inc. v. Med. Ctr. Hosp. of Vt.*, 137 Vt. 142, 145, 400 A.2d 1015, 1017 (1979).

■ ¶ 22. S-S Corp. also argues that the Board misconstrued 24 V.S.A. § 4409(d) as prohibiting group homes larger than six persons from being considered single-family dwellings. Section 4409(d) provides that a "residential care home or group home, serving not more than six persons who are developmentally disabled or physically handicapped, shall be considered by right to constitute a permitted single-family residential use of property."[3] Thus, as S-S Corp. correctly notes, § 4409(d) does not deprive zoning boards of their discretion to treat group homes with more than six residents as single-family dwellings. Section 4409(d), however, is a zoning statute intended to protect residential care facilities from exclusionary zoning, *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 17, 176 Vt. 584, 845 A.2d 332 (mem.); it does not govern Act 250 decisions.

¶ 23. Further, the Board appeared aware of this distinction, as it merely pointed to § 4409(d) for "further guidance," and not as dispositive authority, in determining that the homes, which each house eight persons, were not "conventional residences" under Rule 2(M). While the three concurring Board members "reluctantly" joined in the decision because they were "persuaded" by the definition in § 4409(d), nothing in the concurrence suggests that they believed they lacked discretion under § 4409(d) to decide otherwise.

---

[3] In May 2004, the Legislature repealed § 4409, effective September 1, 2005. 2003, No. 115 (Adj. Sess.), § 119(c). The Legislature replaced § 4409 with § 4412(G), which is similar to § 4409 but increases the size of a group home that shall be considered a single-family residence by right from six to eight residents.

¶ 24. In sum, we see no reason to disturb the Board's conclusions that the Houses qualify as "commercial dwellings" under Rule 2(M) and that together they contain more than ten units under Rule 2(A) and 10 V.S.A. § 6001(3)(a)(iv). Therefore, the Board correctly concluded the Houses were "development" subject to Act 250 review.

*Affirmed.*

¶ 25. **Dooley, J.,** dissenting. To accept the holding on the second issue in this case, I must agree that residents of a community care home are transients although they are predicted to live in the home, on average, three times as long as the average Vermonter will remain in his or home.[4] I also must agree that homes that are predicted to keep residents three times as long as average for all residences in Vermont are "intended for habitation on a temporary/intermittent basis." These propositions are so obviously wrong that no standard of review or creative legal interpretation can save them. Therefore, although I agree with the majority on the first issue — that S-S Corp. has constructed ten or more units — I can't agree that its facilities are "commercial dwellings" as defined in Environmental Board Rule 2(M) and respectfully dissent.

¶ 26. S-S Corp.'s facilities need an Act 250 permit only if they are commercial dwellings. I quote the rule:

> "Commercial Dwelling" means any building or structure or part thereof, including but not limited to hotels, motels, rooming houses, nursing homes, dormitories and other places for the accommodation of people, that is intended to be used and occupied for human habitation on a temporary or intermittent basis, in exchange for payment of a fee, contribution, donation or other object having value. The term does not include conventional residences, such as single family homes, duplexes, apartments, condominiums or vacation homes, occupied on a permanent or seasonal basis.

---

[4] The 2000 Census provides the median year in which Vermont residents moved into the housing they occupied when they answered the census questionnaire. For all residents, the median year was 1993, seven years before the census. For homeowners, the median year was 1989. For renters it was 1998. Thus, occupants of S-S Corp.'s houses stay in the home approximately three times longer than the average stay for other Vermont residents; they stay twice as long as homeowners, and ten times as long as other renters. Vermont Housing Data Website, at *http://www.housingdata.org/profile/profileMain Result.php?submitted=stateProfile* (last modified Aug. 4, 2005).

Rule 2(M). As the majority decision states, "[u]nder Rule 2(M), a commercial dwelling is any building or structure that: (1) is for the accommodation of people; (2) is intended for habitation on a temporary/intermittent basis; and (3) provides facilities in exchange for a payment or fee." *Ante*, ¶ 15. I agree that the first and third requirements of the rule are met. Nothing in the evidence, nor in a reasonable construction of Rule 2(M), supports, however, a holding that the second requirement is met.

¶ 27. The meaning of the rule with respect to the second requirement is unambiguous. A building or structure can be a commercial dwelling *only* if it is intended to be used and occupied for human habitation on a temporary or intermittent basis. While the rule gives examples of buildings that might meet this requirement, they are commercial dwellings only if they meet the general standard. Thus, some, but not all, hotels are commercial dwellings.

¶ 28. The evidence is clear that residents of the homes in question intend to remain in those homes permanently. More importantly, in terms of the regulation wording, the evidence is clear that S-S Corp. intends that the residents will occupy the homes permanently and not on a temporary or intermittent basis. In fact, S-S Corp. has a track record on this issue regarding its residents; in a similar home S-S Corp. owns, the average length of stay is over twenty years. Thus, S-S Corp.'s intent and experience with permanent housing are entirely consistent.

¶ 29. In view of this evidence, how can those people whose occupancy of living places are among the most permanent in Vermont be labeled as transient? The Board and the majority appear to have three arguments to accomplish this legerdemain.

### A. *The Decision Must be Based on Environmental Impact of the Proposed Development*

¶ 30. Exactly where this point leads is not clear from this Court's decision, but it is very clear from the Board's majority[5] decision. In its reconsideration decision, the Board wrote:

---

[5] The Environmental Board decision was decided five to three on the issue on which I dissent. The Environmental Board dissenters, led by the Chair of the Board concluded:

> These Houses (and other homes developed for this population) are not intended to be occupied on a "temporary or intermittent" basis.

> Likewise, the Environmental Board is empowered to regulate property based upon its use, not the identity or the specific characteristics or attributes of its users. *Thus, the Board cannot make a distinction between the Harvey and Owen Houses with their long-term residents, and other group homes, which might be identical in all relevant physical and operational respects to the Harvey and Owen Houses, but whose residents stay only a few weeks or months before, for whatever reasons, they move out.*

(Emphasis supplied.) Earlier, in footnote 3 of that decision, the Board said of the distinction discussed above that "such a distinction would be irrational, something the Board must avoid."

¶ 31. If these words appeared in a decision striking down Rule 2(M) as beyond the rule-making authority of the Board or impermissibly arbitrary, I could understand their presence. Their usage in a decision interpreting the rule demonstrates a Board at war with itself. The distinction between intended temporary occupancy and intended permanent occupancy is *exactly* the distinction drawn in the Environmental Board Rule and it is that distinction that the Board is now calling irrational. While we have no record of why the Board adopted this distinction in the first place, we must assume that it found a difference in environmental impacts. Without even attempting to understand why it drew that distinction in the first place, it is trashing its own work.

¶ 32. If the Board wants to strike down its own regulation, the effect of its action in this case, it at least has to give notice to persons who will rely on the language of the rule. This case is a good example of why we should not accept repeal-by-interpretation, as occurred here. S-S Corp. concluded that it did not need Act 250 permits for the Harvey and Owen Houses, accepted large federal grants for their construction and began construction on the Owen House before it was finally informed that a state official had months earlier sought an official opinion on whether an Act 250 permit was needed. Anyone who read the regulations would conclude that dwellings intended to be residences for persons for twenty years or more are not intended to be occupied on a temporary basis. Persons should not be put in the position of making investment decisions on the risk that the Board will unpredictably change the rules without warning. If the Board is to abandon the distinction it made in the rule, it must do so by rule making.

## B. *The Intent and Record of S-S Corporation is Irrelevant*

¶ 33. In fact, both the majority and Board appear to be talking out of both sides of their mouths on this point. Although the Board said it would not rely on the "subjective particulars"[6] of the operation of the homes, it went on to do just that where it thought those "subjective particulars" supported its result. The majority has followed that same path. This is particularly apparent in the Board's findings that some residents leave the care of the S-S Corp. homes for periods of time and some of those do not return.[7] Having ruled that the specific intent and track record of S-S Corp. is irrelevant, these facts are also irrelevant if one accepts the Board's rationale.

¶ 34. Yet, the Board spends a third of its reconsideration decision quibbling over these irrelevant facts. The point for the Board is not that residents leave the homes for some periods, and some do not return, but that these facts differentiate the residents from others and warrant Act 250 review. Although the facts are entirely against it, the Board wants to raise the inference that the residents of S-S Corp. homes — or mentally disabled residents of community care homes generally — are transient and temporary. The inference is wrong, transparently an attempt to evade the permanency of occupancy in S-S Corp. homes without a factual basis. Rather than adding to the Board's decision, the unexplained caviling over the facts of occupancy in S-S Corp. homes raises questions about its confidence in its primary rationale.

---

[6] The Board's concept of "subjective particulars" migrated between its first and second decision. In the first decision it explained as follows:

> While S-S's record of providing quality care may be inferred from the length of time that residents lived in the Washington Street Home, the Board's jurisdictional determination in this case cannot depend on the personal level of satisfaction of the residents in the care that they receive. Rather, the Board must look to the aspects of the Harvey House and the Owen House that are relevant to Act 250 and ask whether the type of construction and occupation at issue in this matter is typical of the sorts of housing described in Rule 2(M). Thus, the Board must look to the physical structures and general usage of the Harvey House and the Owen House, not to the subjective particulars that may result from their operation.

By the second decision, the only thing relevant about the homes was that they have similarities to nursing homes. It specifically held that the long-term occupancy by the residents was irrelevant.

[7] These "facts" are truly irrelevant because they describe any residency of any type.

¶ 35. Assuming that the majority of the Board remained true to its point that S-S Corp.'s current operations were irrelevant, this position is plainly inconsistent with the wording of the regulation. Again the holding of the Board was that the permanency of occupancy of the residents, or S-S Corp.'s intent with respect to that permanency, could not be considered. Thus, the exact determination that the regulation required the Board to make — the same determination the majority of this Court states is a requirement to find that S-S Corp.'s homes are "commercial dwellings" — is found to be irrelevant by the Board. The rule specifically requires that the buildings being constructed be "commercial dwellings." That requirement is simply not met by a generalization that community care homes are "commercial dwellings" without examining the particular buildings involved.

### C. *All Nursing Homes are Commercial Dwellings; Community Care Homes are Indistinguishable from Nursing Homes*

¶ 36. This is the actual rationale of the Environmental Board. Since the majority of this Court has not stated an alternative rationale, I assume it has accepted the Environmental Board's rationale without stating so. This rationale involves a construction of the rule that is patently wrong.

¶ 37. The premise of this argument is that all nursing homes are commercial dwellings since nursing homes are contained in the nonexclusive list in the regulation. The logic after the premise is that: (1) community care homes are like nursing homes so all community care homes are commercial dwellings; and (2) S-S Corp.'s homes are community care homes so they are commercial dwellings. The problem with this construction is that the premise is clearly wrong because of the presence of the inconvenient language "that is intended to be used and occupied for human habitation on a temporary or intermittent basis." In order to accept the premise, we must accept that the inconvenient language has no independent regulatory significance or that all nursing homes are intended for temporary occupancy *as a matter of fact.*

¶ 38. Not even the majority of this Court accepts that the language has no independent regulatory significance since it holds that occupancy on a temporary or intermittent basis is a requirement of a commercial dwelling. See *ante*, ¶ 15. Indeed, such a construction makes the language superfluous, or mere surplusage, contrary to our construction maxim to avoid such a result. See, e.g., *In re Estate of Cote*, 2004 VT 17, ¶ 13, 176 Vt. 293, 848 A.2d 264. We could sustain the

Board's construction of the regulation only if we hold that there is no independent requirement that any facility be intended to be occupied on a "temporary or intermittent basis."

¶ 39. Further, such a construction necessarily means that the dependent clause in issue — *"that is intended to be used ... on a temporary or intermittent basis"* — modifies and explains the list of facilities — "hotels, motels, rooming houses, nursing homes, dormitories" — and not the general description of facilities "any building or structure or part thereof." Rule 2(M) (emphasis added). The construction is impossible because the dependent clause is stated in the singular, and thus plainly limits the term "any building or structure or part thereof," which is also in the singular. Rule 2(M). The phrase reads: "'[c]ommercial [d]welling' means any building or structure or part thereof ... that is intended to be used ... on a temporary or intermittent basis."

¶ 40. Nor is there anything in the record to support the proposition that all nursing homes intend occupancy on a temporary basis. Terms like "nursing homes" or "community care homes" are broad umbrellas differentiated only by the extent to which they offer nursing care. I have no doubt that, similar to the community care homes run by S-S Corp., there are nursing homes with long-term permanent residents. In any event, if there are facts on this issue, the Board must find them. It failed to do so here.

¶ 41. Although the Board adopted the rationale that all nursing homes are commercial dwellings, it failed utterly to square that rationale with the wording of the regulation. In response to S-S Corp.'s argument that under the regulation some nursing homes would be commercial dwellings, and others would not — *depending* on whether or not the nursing homes were operated on an intermittent occupancy basis — the Board answered "there is no such distinction in the Rule" and "the Board is empowered to interpret its own Rules."[8] The former statement is totally inconsistent with the wording of the rule. The latter is essentially a statement that the Board can do whatever it wants.[9]

---

[8] It also answered that the distinction is irrational as discussed in ¶¶ 30-31 above.

[9] It is particularly unpersuasive for the Board to quote, in support of this reason for its construction, the standard of review applicable to this Court when it reviews a Board's interpretation of a regulation. Essentially, the Board is saying its interpretation is correct because it is the Board and is entitled to deference. I would urge the Board not to use this "might makes right" rationale in future cases.

¶ 42. I end where I started. Labeling buildings with tenants who stay in them for at least twenty years as intended for temporary or intermittent occupancy is nonsensical. But equally bad is the fancy footwork it takes to reach such a decision. The Board adopted a rule that contains a regulatory distinction the Board now opposes. The right response to this new opposition is to amend the rule to eliminate the distinction. The wrong answer is to eliminate the distinction under the guise of tortured construction. By upholding a decision based upon the wrong answer because of a narrow standard of review, we abdicate our responsibility to ensure a fair and just adjudication system.

¶ 43. S-S Corp.'s homes are not commercial dwellings as a matter of law. I dissent.