2009 VT 55

### In re Champlain College Maple Street Dormitory

[980 A.2d 273]

No. 07-155

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 14, 2009

*Todd D. Schlossberg* of *Law Office of Todd D. Schlossberg*, Burlington, for Appellants/Cross-Appellees.

*Mark G. Hall* and *David M. Pocius of Paul Frank + Collins P.C.*, Burlington, for Appellee/Cross-Appellant Champlain College, Inc.

*Kimberlee J. Sturtevant* of *McNeil, Leddy & Sheahan, P.C.*, Burlington, for Appellee City of Burlington.

■ ■ ¶ 1. **Reiber, C.J.** Neighbors appeal from the Environmental Court's order approving, with conditions, Champlain College's application to renovate an existing building and construct a new building for student housing. At issue are the court's findings that the project complied with the City of Burlington's density and setback requirements.[1] We affirm the court's decision.

---

[1] We do not address the issue of the project's compliance with the City's parking requirements, raised by neighbors on appeal and the College on cross-appeal, because that issue is pending before another body. The Environmental Court found that the College needed to account for this project in its institutional parking plan, but concluded that the Development Review Board (DRB) must evaluate the plan, as modified, in the first instance. Thus, while it approved the permit, it conditioned the occupancy of the building on the DRB's approval of the parking plan. While the instant appeal was pending, the DRB approved the parking plan, and neighbors appealed that decision to the Environmental Court. That appeal has now been placed on inactive status, with the parties' agreement, because the College is submitting a new five-year institutional parking plan, which apparently is likely to render neighbors' second appeal moot. In light of the ongoing proceedings concerning the parking plan, it would be premature for this Court to address the parking issue.

We note, however, that our review of the instant case was complicated by the Environmental Court's decision to "approve" the College's permit application but impose a "condition" that required additional proceedings before the DRB. Essentially, one part of this case was remanded to the DRB, while the remainder of the decision was appealed to this Court. We do not agree with neighbors that this approach alone warrants reversal of the Environmental Court's decision, particularly given that the DRB has since approved the parking plan. See *In re Maple Tree Place*, 156 Vt. 494, 500-01, 594 A.2d 404, 407-08 (1991) (trial court has authority to remand case to administrative body for further proceedings even where court's review of administrative action is "de novo"). Such piecemeal review is, however, inefficient and strongly discouraged by this Court. See *Hospitality Inns v. S. Burlington R.I.*, 149 Vt. 653, 656-57, 547 A.2d 1355, 1358 (1988) (a final judgment — one that makes a final disposition of the subject matter before the court — is generally required before appellate review is appropriate, and this requirement serves policy of avoiding piecemeal review); see also *In re Pyramid Co.*, 141 Vt. 294, 300-01, 449 A.2d 915, 918 (1982) (weighty considerations support

¶ 2. The record indicates the following. Champlain College owns a 4.6 acre lot in the City of Burlington with frontage on three streets. The lot adjoins city-owned property, and at the time of the court's decision, it contained nine buildings and their associated parking lots. The lot is located within the University Campus (UC) zoning district as well as the Champlain College Core Campus Overlay (CCO) district. As noted above, the College proposed to renovate an existing building and construct a new 18,000 square-foot building on this lot to create forty-nine new student rooms to house ninety-four students.

¶ 3. In June 2005, the DRB approved the College's application with conditions. Neighbors appealed to the Environmental Court, and the College cross-appealed. After a hearing and a site visit, the Environmental Court issued an order approving the application with conditions. As discussed in additional detail below, the court found in relevant part that the project satisfied the City's density and setback requirements. This appeal followed.

¶ 4. We begin with the court's evaluation of the City's density requirements. The court identified two provisions of the zoning ordinances, then in effect, that appeared to set the density

---

finality requirement, including avoiding the unnecessary delay, expense, and waste of scarce judicial resources associated with piecemeal review, as well as avoiding having this Court decide legal questions in a vacuum, without benefit of factual findings). While it does not appear that this appeal is taken from an actual final judgment order, dismissal of this case at this stage "would not serve the interests of judicial economy or any of the persons or entities involved." *Kelly v. Lord*, 173 Vt. 21, 34, 783 A.2d 974, 985 (2001). We thus exercise our discretion under Vermont Rule of Appellate Procedure 2 to suspend the rules and reach the merits. See *Chioffi v. Winooski Zoning Bd.*, 151 Vt. 9, 10 n.1, 556 A.2d 103, 104 n.1 (1989) (similarly suspending rules and allowing zoning appeal to proceed in interests of expediting a decision, despite absence of final judgment order); see also *Perry v. Med. Practice Bd.*, 169 Vt. 399, 402, 737 A.2d 900, 902 (1999) (although procedures for perfecting interlocutory appeal were not followed, dismissal of appeal would likely result in another appeal after final judgment, merits had been fully briefed and Court had reviewed case; therefore, Court exercised discretion to suspend rules and reach merits).

Finally, we note that there are several outstanding motions in this case, which we deny as moot. In December 2007, neighbors filed a renewed motion to enjoin the proceedings before the DRB while this appeal was pending. The proceeding before the DRB has since been concluded, and as noted above, neighbors' appeal of this decision to the Environmental Court is currently on waiting status. The College moved in January 2008 to dismiss the setback and density issues before this Court. That motion appears to have been based on zoning provisions that were subsequently rescinded by the City. We therefore deny both motions as moot.

requirements for the project — § 3.2.7(e), which specifically applied to the CCO district, and article 5, part 2, which provided general density requirements for various districts in the City, including the UC district. Section 3.2.7(e) stated that "[r]esidential density shall be at a maximum of 24 units per acre within the CCO inclusive of inclusionary units."[2] Article 5 provided that the maximum allowable residential density "shall be in accordance with Table 5-B," which for the UC District was twenty net "dwelling units" per acre, with a bonus allowed for inclusionary units up to a maximum of twenty-four dwelling units per acre.

¶ 5. The Environmental Court concluded that although these provisions appeared to create an ambiguity, the application of the CCO's specific residential density provision to this project harmonized the ordinance provisions and avoided surplusage. The court also found its interpretation consistent with the purpose underlying the CCO district, which was to "provide a more urban configuration of the institution's core campus in order to accommodate future growth without further intrusion into surrounding residential neighborhoods." BZO § 3.2.7. Thus, using the 24-unit per acre figure, the court concluded that the maximum residential density on the entire parcel was 110.4 "units."

¶ 6. The court next considered the meaning of the term "unit" as applied to a dormitory. As reflected above, the regulations in article 5 described density in terms of "dwelling units per acre." The regulations also referred to "residential units," "units," and "inclusionary units," but did not further define these terms, with the exception of inclusionary units. A "dwelling unit" was defined in part as "a room or set of rooms fitted with a private bath, kitchen, and living facilities," *id.* § 30-5, and the court found that dormitory rooms did not fit within this definition.

¶ 7. The City had relied on a definition of "rooming unit," found elsewhere in the ordinances, to calculate density. See Burlington Code of Ordinances § 18-2 (defining "rooming unit" to mean "any room or group of rooms forming a single habitable unit used or

---

[2] The City provides a density bonus for "inclusionary units," but the project here was expressly exempt from any obligation to include such units. See Burlington Zoning Ordinances (BZO) § 14.1.16(a) (exempting from inclusionary-zoning requirements those "[p]rojects that are located within a UC zoning district that are developed by an educational institution for the exclusive residential use and occupancy by that institution's students"). "Inclusionary units" are affordable dwelling units. *Id.* § 30-12(j).

intended to be used for living and sleeping, but not for cooking or eating purposes"). The ordinances provided that any four "rooming units" were considered a single housing unit in applying the housing replacement requirements of article 15. The City's zoning administrator testified that he used the four-to-one ratio to measure the density of dormitory projects as well as any other type of rooming house projects in the City. The court found that while the City's approach might be reasonable for a dormitory having only single or double rooms, it became unreasonable where dormitory rooms were to be occupied by three or more students because it would allow for a much higher density occupation than standard size dwelling units.

¶ 8. Nonetheless, the court calculated the project's density using both the City's method — treating four student rooms as a dwelling unit equivalent — and its own method, treating each student room, regardless of the number of beds, as one "residential unit." The court found that the project met the City's maximum allowable density of 110 units using either method. Using the court's method, there were 106 units; using the City's method, there were 43 units.

¶ 9. Neighbors challenge the court's conclusion on appeal. They assert that the maximum allowable density for this project is 92 units, not 110 units. According to neighbors, the College is not entitled to a twenty percent bonus for inclusionary units because the project does not include inclusionary units, and it is in fact exempt from such requirements. They note that both the City and the College relied on the twenty-unit figure in their pretrial filings with the court. Neighbors maintain that each dormitory room should count as a "housing unit" and thus, they assert that because this project creates 106 units, it violates the City's density requirements.

¶ 10. We affirm the Environmental Court's conclusion that the project complied with the City's density requirements, mindful that these requirements and the method of calculating density within the CCO district has changed as of 2008.[3] In affirming the

---

[3] The current zoning regulations regulate density by identifying a maximum number of "residential beds" for the "residential core campus" and the "academic core campus" within the Champlain College district. See BZO, article 4, at p. 4-69. The regulations allow for a maximum of 530 beds in the residential core campus, and 150 beds in the academic core campus. Id.

court's decision, we do not decide if the court erred in concluding that the maximum allowable density was 110 units because the project also complied with the 92-unit standard. Dormitory rooms plainly did not fall within the City's definition of a "dwelling unit." The City's approach — treating dormitory rooms as "rooming units" — was reasonable, and the City presented evidence that it used the four-to-one ratio to measure the density of dormitory projects as well as any other type of rooming house project in the City. The regulations now specifically refer to dormitory rooms as an example of "rooming units," see BZO article 13, at 13-36, and they provide that any four "rooming units" shall be considered a single housing unit in calculating density for the requirements of Article 4, although as noted above, the method of measuring density in the Champlain College district has changed. We defer to the approach taken by the City below, which appears to have been applied consistently, and we uphold the Environmental Court's conclusion that the project complies with the density requirement. See *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990) (Court gives deference to interpretation of zoning ordinance by local administrative body); cf. *Washington v. Pierce*, 2005 VT 125, ¶ 33, 179 Vt. 318, 895 A.2d 173 ("Where, as here, a legislative body enacts a law that clarifies an earlier law, the subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.") (quotation omitted). We are not persuaded to a contrary conclusion by *In re S-S Corp./Rooney Housing Devs.*, 2006 VT 8, 179 Vt. 302, 896 A.2d 67, cited by neighbors. That case involved the Environmental Board's interpretation of the term "unit" for purposes of determining if a certain project constituted "development" subject to Act 250, and it is not helpful here.

¶ 11. We turn next to the court's findings regarding the setback requirements. The court explained that the College had merged seven lots to create a single large lot. The resulting lot was a "corner lot" because it abutted two streets at their intersection, and as such, it had more than one front yard. In this case, it had one front yard facing South Willard Street, one facing Maple Street, and one facing Main Street. In light of the City's consistent interpretation of the corner-lot provision, and for the reasons set forth in earlier cases, the court found that the lot lines perpendicular to each of the streets were considered side-lot lines. Applying this approach, the court concluded that the project complied with the City's setback requirements.

¶ 12. Neighbors disagree with the court's analysis, asserting that a rear-lot setback requirement should apply to this project. They maintain that, under the court's rationale, any new structure on this lot will be exempt from rear setback requirements, no matter where it is located. They complain that there was no showing that the City had ever considered this or any other similar parcel as a "corner lot," or applied side-yard setback requirements to a project located in the middle of a block, on a lot more than 400 feet from any corner. They assert that the court's decision is not authorized by the City's zoning ordinances, and that it defies common sense.

¶ 13. In interpreting zoning ordinances, we apply familiar rules of construction. First, we "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." *In re Stowe Club Highlands*, 164 Vt. 272, 279, 668 A.2d 1271, 1276 (1995). "If there is no plain meaning, we attempt to discern the intent from other sources without being limited by an isolated sentence." *Id.* at 280, 668 A.2d at 1277 (quotation omitted). On review, we will uphold the Environmental Court's construction of an ordinance "unless it is clearly erroneous, arbitrary or capricious." *Id.*

■ ■ ¶ 14. The court's conclusion here is consistent with the plain language of the regulations, and we therefore affirm its decision. A "corner lot" is defined in the City's zoning ordinances as "[a] lot abutting on two (2) or more streets at their intersection." This long lot, which on both ends abuts two streets at their intersection, falls within this definition. The ordinance does not create an exception for large lots or lots created by merger, and we will not create one here. See *Murphy Motor Sales, Inc. v. First Nat'l Bank of St. Johnsbury*, 122 Vt. 121, 123-24, 165 A.2d 341, 342 (1960) (explaining that "[z]oning laws which curtail and limit uses of real property must be given a strict construction, since they are in derogation of common law rights," and court "may not insert in a zoning regulation a provision not included by the legislative body"). Moreover, we note that these contiguous lots would apparently have been treated as one lot, regardless of the merger. See BZO § 3.2.7(d)(1) ("Setback requirements as stipulated in Article 5 shall be applicable only to the perimeter of any contiguous ownership of Champlain College within the same block and not separated by a public or private street.").

■ ¶ 15. Pursuant to the ordinance, a "front yard" is defined as "[a]ny yard or open space extending across the full width of the lot along any street lot," and a "corner lot" is deemed to have "more than one front yard." BZO § 5.3.5(a). As the court found, the lot here faced three streets and thus it had three "front yards." The court reasonably labeled those lot lines adjacent to the front yard lines as side yard lines, rather than rear lot lines, so as to avoid the result of having a front and a rear lot line being adjacent to and forming a corner with one another. As reflected above, the court also found that the City had consistently applied setback requirements to corner lots in this way, lending further support to the court's conclusion. *In re Duncan*, 155 Vt. at 408, 584 A.2d at 1144.

■ ¶ 16. Neighbors complain that there was no showing that the City had previously treated this lot as a corner lot, or applied this approach to projects located more than 400 feet from any corner. We find these arguments unpersuasive. Neighbors would essentially have us rewrite the zoning ordinances to declare that large lots cannot be corner lots under the City's definition of that term, or to mandate that the City must treat large corner lots differently from other corner lots. This we will not do. Cf. *Murphy Motor Sales*, 122 Vt. at 123, 165 A.2d at 342 (a court must not legislate "in the guise of construction"). Where, as here, the language of the ordinance is plain, we must enforce it as written. This lot is a corner lot as defined by the City, and the City treated it the same way that it has treated other corner lots. Given this, the court did not commit clear error or abuse its discretion in applying the front and side-yard setbacks to this project, and concluding that the setback requirements were satisfied.

*Affirmed.*